Nelson WILLIAMS, Aimee Exnicios, Michael Pappas and Shirley Deutsch, Individually and on behalf of all others similarly situated, Plaintiffs,

v.

CITY AND COUNTY OF SAN FRANCISCO, a Municipality; San Francisco Juvenile-Probation Department; Joseph J. Botka, Individually and in his official capacity as Chief Juvenile Probation Officer of the San Francisco Juvenile Probation Department; San Francisco Civil Service Commission; Darrell Salomon, Wm. Jack Chow, Joseph C. Tarantino, Frank Alioto and Genevieve Power, Individually and in their official capacities as members of the San Francisco Civil Service Commission; and John J. Walsh, Individually and in his official capacity as general manager of the San Francisco Civil Service Commission, Defendants.

Nos. C-77-1312 SW, C-78-0171 SW.

United States District Court,
N. D. California.

Sept. 26, 1979.

336

Carter, Cook, Phillips & Voltz, Professional Corp., Barbara Ashley Phillips, Morton H. Orenstein, Huali G. Chai, San Francisco, Cal., for plaintiffs.

George P. Agnost, City Atty., Michael C. Killelea, Deputy City Atty., Stephanie M. Chang, Staff Atty., San Francisco, Cal., for defendants.

William T. Beirne, O'Byrne & Beirne, San Francisco, Cal., for interveners Frederick J. Kennedy, et al.

## MEMORANDUM DECISION

SPENCER WILLIAMS, District Judge.

These cases are before the court on plaintiffs' motions for preliminary and permanent injunctions and for summary judgment. After careful consideration of the briefs and arguments of counsel, the pleadings, affidavits and depositions on file, and the other evidence in the record, the court finds the plaintiffs are entitled to partial summary judgment.

### I.

The procedural posture of these cases merits a brief review. Shortly after the complaint was filed in *Williams I*, (C–77–1312 SW), plaintiffs moved for the issuance of a preliminary injunction and for the entry of summary judgment in their favor. Evidentiary hearings were conducted on July 8, July 11, July 22, September 9 and September 12, 1977. At the outset of the hearing on July 8, 1977 the court announced that all evidence received on the preliminary injunction would be a part of the record for the permanent injunction and would not be repeated. In response to the court's query whether there would be any additional evidence for the court to consider at the preliminary injunction hearing defendants indicated they desired to call Dr. Sheldon Zedeck to testify regarding the validity of the test.

Coincident with the filing of plaintiffs' motions, defendants moved to dismiss the complaint for lack of subject matter jurisdiction. By written memorandum filed November 15, 1977 the court granted defendants' motion in part, ruling that it lacked jurisdiction over all the Title VII claims and the ADEA claims of all plaintiffs except Nelson Williams. Since Mr. Williams had properly invoked the jurisdiction of the court with a claim under 42 U.S.C. § 1981, the court allowed him to supplement his complaint with his "subsequently ripened"

ADEA claim. However, the court denied his motion for summary judgment on the § 1981 claim and ordered further briefing on what constituted a prima facie case under the ADEA. Summary judgment on Williams' ADEA claim was denied on May 9, 1978.

After receiving their right to sue letters plaintiffs filed *Williams II*, (C–78–0171 SW), asserting the Title VII and ADEA claims that had been dismissed from *Williams I*. The court ordered the cases consolidated and ordered the record in *Williams I* to be made a part of the record in *Williams II*. Prior to the submission of the instant motions plaintiffs sought and were granted certification of the alleged class.

### II.

Rule 56 provides for the granting of summary judgment where there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Plaintiffs maintain all the evidence is before the court and the matter is ripe for final decision. Defendants, on the other hand, claim summary judgment cannot be granted because the statistical experts who testified at the preliminary injunction hearing disagreed in their evaluation of the test results. What defendants fail to perceive is that there is no need for a trial, not because there is no conflict in the evidence, but because the matter has already been tried. To the extent the statistical issue raises questions of fact, rather than questions of law, the court already has had the opportunity to judge the demeanor of the expert witnesses and weigh their credibility. Had plaintiffs never moved for summary judgment, the testimony would not have been repeated because Rule 65 explicitly provides that "any evidence received upon an application for a preliminary injunction which would be admissible upon the trial on the merits becomes part of the record on the trial and need not be repeated."

Although courts customarily do not consider oral testimony on a summary judgment motion there is authority for includ-

ing testimony taken at an earlier stage in the case as part of the evidence considered in a summary judgment . motion. 10 C. Wright & A. Miller, Federal Practice and Procedure § 2723 at 488; Fed.R.Civ.Pro. 43(e). In one such case the Ninth Circuit wrote:

> It is clear that the court elected to regard the oral testimony and the various documents, introduced at the jury hearing on the statute of limitations, as supplementing the original affidavits filed in support of the motions for summary judgment, and . . . as being in the same category and having the same force and reliance as the papers, depositions and admissions which may be employed under Rule 56, R.Civ.P. This posture of the case justified the court in so regarding this additional evidence, and the procedure it adopted appears to be both rational and in harmony with the spirit and the purpose of the Rules of Civil Procedure. See R.Civ.P. 43(e). . . .
>
> . . . . .
>
> The merits of appellant's case were given so thorough an examination at the hearing on the special issue that the resultant judgment was not the product of mere trial by affidavits. *Burnham Chemical Co. v. Borax Consolidated,* 170 F.2d. 569, 573, 575 (9th Cir. 1948).

On this authority the court is persuaded the circumstances of these cases permit a decision on the merits to be made at this time and that such a decision is not the product of a "mere trial by affidavits."

### III.

These motions provide the court with the first opportunity to view the evidence in the record from the perspective of Title VII. The test for determining whether Title VII has been violated is a familiar one.

> The first question is whether plaintiffs have established a prima facie case of employment discrimination. . . . If a prima facie case has been shown, the burden then shifts to the employer to justify the employment practice in question. . . . If the employer meets his

burden of justification, plaintiffs may then show that alternative selection devices exist that would serve the employer's legitimate interests without discriminatory effects. *Blake v. City of Los Angeles,* 595 F.2d 1367, 1372 (9th Cir. 1979).

When a Title VII plaintiff claims an employment test is discriminatory in effect he establishes a prima facie case by showing the test in question selects applicants for hire or promotion in a racial or sexual pattern significantly different from that of the pool of applicants. *Albemarle Paper Co. v. Moody,* 422 U.S. 405, 425, 95 S.Ct. 2362, 45 L.Ed.2d 280 (1975). The employer may justify his use of the test only by showing it to be necessary to safe and efficient job performance. *Dothard v. Rawlinson,* 433 U.S. 321, 332 n. 14, 97 S.Ct. 2720, 53 L.Ed.2d 786 (1977). This business necessity defense is very narrow and it is not easy for employers to demonstrate the job relatedness of selection devices shown to be prima facie violations of Title VII. *Blake v. City of Los Angeles,* 595 F.2d 1367, 1377 (9th Cir. 1979).

Plaintiffs here seek relief from the alleged discriminatory testing of applicants for senior and supervisor juvenile probation officer positions. Prior to the making of appointments from the disputed lists and since the 1960's the positions in question were filled by seniority. Although these placements were "temporary" many senior and supervising juvenile probation officers had held their positions for years before they were displaced by persons appointed from the challenged lists. These lists were the result of written tests conducted in October 1976 and subsequent oral interviews administered to those who passed the written tests.

Defendants have argued the interviews which were used to rank applicants for appointment are not tests because they did not disqualify anyone from promotion. This position is plainly unsupportable since the EEOC Guidelines specifically define "tests" to include scored interviews and interviewers' rating scales, 29 C.F.R. § 1607.2 (1978), and further provide that "[t]he use

of any test which adversely affects hiring, promotion, transfer or any other employment or membership opportunity of classes protected by Title VII constitutes discrimination," 29 C.F.R. § 1607.3 (1978). It seems evident one's chances for promotion may be more effectively thwarted by a low position on an appointment list with a long period of use, than by regularly administered pass/fail examinations.

The court has been presented with many different appraisals of the written exam and oral interview results—statistics based on pass/fail data for both written tests individually and combined, statistics based on placement on the oral interview ranking list, and statistics based on the overall selection process. Generally speaking, defendants have taken the position that the sample of black applicants is too small to permit statistical analysis and that the difference in selection rates of men and women is not statistically significant.

■ A complete review of all the evidence and arguments would serve no useful purpose because it is the court's conclusion that the written exam and oral interview must be evaluated as a single selection process and that the results must be considered separately for each position. In other words, the appropriate comparison is between the pool that applied for each position and those who were selected. This is so because the written exam and oral interview were designed as a unit, to test different capacities but with the single purpose of selecting those most qualified for the positions. Looking at the exam and interview separately is not consistent with the employer's design or use of either one.

Set out below are the comparative selection rates using both defendants' and plaintiffs' data.

### SENIOR JUVENILE PROBATION OFFICER (8442)

| | SEX | NUMBER OF APPLICANTS | NUMBER OF SELECTEES | PERCENT SELECTED | COMPARATIVE SELECTION RATIO |
|---|---|---|---|---|---|
| Defendants' | Male | 30 | 8 | 27% | |
| Data | Female | 23 | 3 | 13% | 48% |
| Plaintiffs' | Male | 31 | 8 | 26% | |
| Data | Female | 23 | 4 | 17% | 65% |
| | RACE | | | | |
| Defendants' | White | 43 | 9 | 21% | |
| Data | Black | 5 | 1 | 20% | 95% |
| Plaintiffs' | White | 40 | 10 | 25% | |
| Data | Black | 5 | 1 | 20% | 80% |

### SUPERVISOR JUVENILE PROBATION OFFICER (8414)

| | SEX | NUMBER OF APPLICANTS | NUMBER OF SELECTEES | PERCENT SELECTED | COMPARATIVE SELECTION RATIO |
|---|---|---|---|---|---|
| Defendants' | Male | 38 | 6 | 16% | |
| Data | Female | 21 | 2 | 10% | 63% |

| | SEX | NUMBER OF APPLICANTS | NUMBER OF SELECTEES | PERCENT SELECTED | COMPARATIVE SELECTION RATIO |
|---|---|---|---|---|---|
| Plaintiffs' | Male | 38 | 7 | 18% | 55% |
| Data | Female | 21 | 2 | 10% | |
| | RACE | | | | |
| Defendants' | White | 45 | 7 | 16% | 0% |
| Data | Black | 6 | 0 | 0% | |
| Plaintiffs' | White | 47 | 7 | 15% | 0% |
| Data | Black | 6 | 0 | 0% | |

The EEOC Guidelines do not provide any measure for determining adverse effect. However, the United States Department of Justice Guidelines on Employee Selection explain that "[a] selection rate for any racial, ethnic or sex group which is less than (⅘) (or eighty percent) of the rate for the group with the highest rate will generally be regarded as evidence of adverse impact." 28 C.F.R. § 50.14 § 4b (1978). Measured against this standard the senior and supervisor selection processes demonstrate adverse impact. The selection rate for women for both positions using either plaintiffs' or defendants' data is substantially less than 80% of the selection rate for men. The comparative selection rate for black senior applicants shows no adverse effect, but the comparative selection rate for black supervisor applicants shows overwhelming adverse impact since no blacks were selected for the supervisor positions.

The Justice Department Guidelines caution that differences in selection rate may not demonstrate adverse impact if the differences are based on small numbers and are not statistically significant. 28 C.F.R. § 50.14 § 4b (1978). This same sentiment has been expressed in a number of cases. *See e. g., Teamsters v. United States,* 431 U.S. 324, 340 n. 20, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977); *Mayor of Philadelphia v. Educa-*

*tional Equality League,* 415 U.S. 605, 620, 94 S.Ct. 1323, 39 L.Ed.2d 630 (1974); *Morita v. Southern Cal. Permanente Medical Group,* 541 F.2d 217, 220 (9th Cir. 1976); *Harper v. Trans World Airlines, Inc.,* 525 F.2d 409, 412 (8th Cir. 1975); *Robinson v. City of Dallas,* 514 F.2d 1271, 1273 (5th Cir. 1975); *Bridgeport Guardians Inc. v. Members of Bridgeport Civil Service Com.,* 482 F.2d 1333, 1338 (2nd Cir. 1973); *Ochoa v. Monsanto Co.,* 473 F.2d 318, 320 (5th Cir. 1973); *EEOC v. Sheet Metal Workers,* 463 F.Supp. 388, 399 (D.Md.1978); *Lee v. City of Richmond,* 456 F.Supp. 756, 766 (E.D.Va. 1978); *Friend v. Leidinger,* 466 F.Supp. 361, 371 (E.D.Va.1977); *James v. Stockham Valves and Fittings Co.* 394 F.Supp. 434, 487 (N.D.Ala.1975). However, other courts have found disparate impact despite problems with the sample size and its statistical significance. *Chicano Police Officers Ass'n v. Stover,* 526 F.2d 431, 439 (10th Cir. 1976); *League of United Latin American Citizens v. City of Santa Ana,* 410 F.Supp. 873, 902 (C.D.Cal.1976). A review of all these cases has persuaded the court that hard and fast rules do not apply.

Statistics are used in Title VII cases for the purpose of demonstrating that an observed disparity could not have been the product of random chance. Where in-

dependent evidence corroborates the inference of discrimination that arises from the observed disparity the absence of statistical significance should not defeat the case. In this regard the Tenth Circuit has written:

> The smallness of the sample should not be grounds here for rejecting the proof. If it were, the tendency would be to deny employees in small plants the type of protection the civil rights statutes afford. *Chicano Police Officers Ass'n v. Stover,* 526 F.2d 431, 439 (10th Cir. 1976).

When the sample is small the analysis of a disparate treatment prima facie case may be helpful. Under *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), such a case is proven by showing the applicant was not selected to fill a position for which he applied and was qualified and the employer continued to take applications or filled the position with a person (not of the applicant's race, etc.) who had equal or lesser qualifications. If the group which was adversely affected by the test was objectively qualified for the position, the inference arises that the test results were not the product of random chance, but of unlawful bias.

■ The corroborative evidence in this case lies in the fact persons who had been filling the senior and supervisor positions on a "temporary" basis were disqualified by the selection procedure from filling those positions. Because the department did not maintain performance evaluations there is no evidence the "temporary" appointees were not performing the jobs with the utmost competence. Therefore, if the selection procedure had operated to choose those most suited for the jobs the "temporaries" would have been selected because of their greater experience and training. Since this did not happen the selection results cannot be ascribed to lesser qualifications of female and black applicants.

One example suffices to make the point. Plaintiffs Shirley Deutsch and Aimee Exnicios both had served as "temporary" supervisors—one for two and one-half years and the other for one year, eight months. Both applied to be supervisors and neither was selected. Of the nine persons appointed, seven were males only one of whom had ever served as a temporary supervisor. This evidence alone probably would make a prima facie case under *McDonnell Douglas.* For this reason, neither the size of the sample, nor the lack of clear statistical significance, persuades the court that the apparent adverse effect should be disregarded. Plaintiffs have raised the inference that the selection procedure impermissibly discriminated on grounds of race and sex and the burden has shifted to the defendants to demonstrate the validity of the selection process.

■ As set forth above an employer may justify the use of employment device which has an adverse impact on a protected group only by showing it to be necessary to safe and efficient job performance. The EEOC Guidelines on testing draw upon and make reference to professional standards of test validation established by the American Psychological Association. 29 C.F.R. § 1607.5 (1978). Under those guidelines empirical evidence of a test's "criterion" related validity is required, except that evidence of "content" or "construct" validity may be acceptable where criterion related validity is not feasible. *Id.* The Department of Justice Guidelines on Employee Selection show no preference for the manner of validation, accepting on an equal basis studies demonstrating content, construct and criterion related validity. 28 C.F.R. § 50.14 § 5a (1978). All three validation methods, however, have two distinct aspects. The employer first must determine what are the important elements of work behavior. Then he must demonstrate that his selection devices are predictive of or significantly correlated with the elements of work behavior that have been identified as important. *Blake v. City of Los Angeles,* 595 F.2d 1367, 1378–79 (9th Cir. 1979).

Frances Kaplan, who designed the written examination and oral interview procedure, testified in her deposition that she followed a content validation strategy. Plaintiffs contend the selection procedure

was not validated by professionally acceptable means before the fact and that it is incapable of validation after the fact. Defendants have not offered any new evidence relating to the selection procedure's validity in opposition to plaintiffs' summary judgment motion, although they would have been expected to submit an affidavit from Dr. Zedeck if his testimony would have approved the selection process designed by Kaplan.

 Preliminarily it should be noted the selection procedure is not susceptible of a criterion related validation study. Such a study requires demonstration of a statistically significant correlation between performance on the exam and performance on the job. Since the Juvenile Probation Department did not maintain a system for judging the quality of job performance it would be impossible to perform a criterion related validation study after the fact. However, defendants have made no effort to show why they could not have adopted the procedures necessary to establish a basis for a criterion related validation study or any other reason why the criterion method of validation was not "feasible" within the meaning of the EEOC Guidelines. In addition, defendants have offered no explanation why the "temporary" seniors and supervisors did so poorly in the selection process when they had the greatest experience in the jobs. Having reviewed all the evidence the court is persuaded the selection procedure was not a valid measure of the knowledge, skill and behavior essential to the jobs.

There is substantial evidence in the record that the content of the written examinations did not closely approximate the tasks to be performed on the job by the applicant. Approximately 60% of the questions on the senior and supervisor juvenile probation officer exams were taken from the senior and supervising adult probation officer exams. Furthermore, approximately 85% of the questions on the senior and supervisor juvenile probation officer exams were the same. While this great overlap does not prove a lack of validity it does

suggest that the common questions did not test for *essential* knowledge, skills or behaviors. In this regard, Dr. Enneis testified the written exams could not be content validated because too many of the questions were so general in nature as to be aptitude questions.

After the written exams were administered and protests were filed, more than 10% of the questions were eliminated from each exam and additional answers were allowed for approximately another 10% of the questions. Re-evaluation of 20% of the exam questions is especially important when the defendants have produced no evidence to demonstrate the validity of the cut-off score. *See* 28 C.F.R. § 50.14 § 13c(6) (1978).

From the court's perspective, however, the critical defect in the selection procedure was the oral interview. The interviewing was accomplished by five different boards, four with four members and one with three members. As a result, all of the applicants were not interviewed by the same group or even the same number of interviewers. The panels were given a list of suggested questions, but the applicants were not asked a standard set of questions in a standard way which might be used to validate the ranking procedure. Furthermore, the interviewers ranged widely in their average scores probably accounting for selection results based upon vagaries of the scale rather than differences in ability. All but one of the "temporary" supervisors were interviewed by the first panel and none ranked high enough to be selected. The one temporary supervisor who was interviewed by a different panel was selected.

A final point deserving note is that the applicants were rated for capacities that may not be subject to content validation. The four, equally weighted categories for senior applicants were—ability to communicate, ability to work in a stressful situation, ability to supervise, and ability to participate in policy-making, and for supervisor applicants they were—ability to communicate, ability to supervise, ability to participate in policy-making, and ability to budg-

et. The Department of Justice Guidelines explain that a selection procedure based on inferences about psychological processes cannot be supported by content validity alone. Therefore, content validity by itself is not an appropriate validation strategy for intelligence, aptitude, personality or interest tests. 28 C.F.R. § 50.14 § 12c(1) (1978).

The facts above make it apparent to the court no additional evidence is needed because the selection procedure cannot be validated. The observation of another court is here apropos:

> Although perfect tests are goals as illusory as perfect schools or perfect courts, the evidence justifies compelling defendants to attempt to fashion a more sensitive test, one that will not needlessly serve as a "built-in headwind" to competent minorit[ies], . . . Boston Chapter, NAACP Inc. v. Beecher, 504 F.2d 1017, 1022 (1st Cir. 1974).

## IV.

■ The court previously denied plaintiffs' motion for summary judgment in *Williams I* on the 42 U.S.C. § 1981 claim, citing *Washington v. Davis*, 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976). The evidence before the court is no different at this stage of the proceedings. However, after the court's November 15, 1977 memorandum the Ninth Circuit ruled that disproportionate impact will suffice to establish a prima facie case of employment discrimination under § 1981, thus removing any distinction between liability based upon Title VII and § 1981. *Davis v. County of Los Angeles*, 566 F.2d 1334, 1340 (9th Cir. 1978). Subsequently, the United States Supreme Court found the case moot and vacated the judgment of the Court of Appeals with instructions to the trial court to dismiss the action. *County of Los Angeles v. Davis*, 440 U.S. 625, 627, 99 S.Ct. 1379, 59 L.Ed.2d 642 (1979). Despite the contrary view of the Ninth Circuit, this court remains convinced that a § 1981 plaintiff must prove discriminatory intent and therefore plaintiffs are not entitled to summary judgment on this claim.

## V.

Plaintiffs' ADEA claims have also been before the court previously. The court denied plaintiffs' motion for summary judgment in *Williams I* based upon the same evidence now presented. A second look has not persuaded the court to depart from its earlier ruling.

■ The ADEA protects persons aged 40 to 70 from discrimination in employment because of their age. Its remedial purpose and borrowed language draw an obvious parallel to Title VII. However, there is little case law actually illuminating the nature of a prima facie case under the ADEA or exploring the degree to which Title VII standards and proofs form a suitable analogy. *See, e. g., Loeb v. Textron, Inc.*, 600 F.2d 1003 (1st Cir. 1979); *Laugesen v. Anaconda Co.*, 510 F.2d 307, 311–13 (6th Cir. 1975); *Hodgson v. First Fed. Sav. & L. Ass'n*, 455 F.2d 818, 822–23 (5th Cir. 1972). The clear impediment to wholesale adoption of Title VII case law is that age, unlike race and gender, is a progressive condition.

Plaintiffs' case presents two hurdles for the court. First, it requires adoption of the *Griggs v. Duke Power Co.*, 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971), standard for a prima facie case under the ADEA, and second, it requires the court to draw a line at age 50 dividing the group protected by the Act. The court has discovered only one case in which this manner of proof has been accepted, and in that case there was substantial corroborative evidence of age discrimination. *Mistretta v. Sandia Corp.*, 15 E.P.D. ¶ 7902 (D.N.M.1977).

Related to the problem of allowing a prima facie case to be made by the free-wheeling selection of an age at which the adverse effect appears most dramatic is the lack of any standard to measure to legal significance of that adverse effect. The four-fifths rule from the Department of Justice Guidelines is unavailable because those Guidelines have no application to the ADEA. 28 C.F.R. § 50.14 § 1 (1978). However, even when the selection results are

reviewed in the manner plaintiffs advance—that is, comparing applicants aged 50 and older with applicants under 50—there is no plausible discrimination against senior applicants aged 50 and older because they were selected at a higher rate than their younger competitors. Plaintiffs' only conceivable case is against the supervisor selection results.

■ Plaintiffs have failed to persuade the court that the evidence in the record establishes a prima facie case of age discrimination. Accordingly, plaintiffs' motion for summary judgment on the ADEA claims must be denied.

### VI.

■ Plaintiffs' have moved once again for the entry of a preliminary injunction and for the entry of a permanent injunction setting aside the test results, voiding placements already made from the lists, restoring persons displaced from temporary assignments to their former positions, and ordering the defendants to refrain from making appointments except on a seniority basis until a validated selection process has been adopted. For the reasons given two years ago, the court finds the circumstances inappropriate for the entry of a preliminary injunction. Plaintiffs will suffer no irreparable injury pending the entry of final judgment. At the time judgment is entered the court will order such declaratory and injunctive relief as it deems appropriate.

IT IS SO ORDERED.