**Onie COOPER, Individually and on behalf of all others similarly situated, Plaintiff,**

v.

**The DEPARTMENT OF ADMINISTRATION, STATE OF NEVADA; Howard E. Barrett, individually and in his official capacity as Director of the Department of Administration; Department of Personnel, State of Nevada, James F. Wittenberg, individually and in his official capacity as Director of the Department of Personnel, and John Does I through X, Defendants.**

No. CIV–R–80–15–ECR.

United States District Court, D. Nevada.

Nov. 22, 1982.

246

Charles R. Zeh, Washoe Legal Services, Sparks, Nev., for plaintiff.

Richard H. Bryan, Atty. Gen., Carson City, Nev., for defendants.

## MEMORANDUM DECISION

EDWARD C. REED, Jr., District Judge.

Plaintiff, a black man, alleges he was denied employment as Affirmative Action Officer of the Nevada State Division of Personnel (hereafter referred to as Personnel Division) by reason of racial discrimination. He has brought this civil rights action for damages, declaratory and injunctive relief under Title VII, 42 U.S.C. §§ 2000e et seq., and under 42 U.S.C. §§ 1981, 1983 and 1985. Jurisdiction of the Court is invoked pursuant to 28 U.S.C. §§ 1331, 1343(3) and (4), 2201 and 2202. In the view of the Court the separate claim based on pendent jurisdiction under the Nevada Constitution is superfluous and need not be considered.

On September 21, 1978, plaintiff's application for the position of Affirmative Action Officer was received and accepted by the Personnel Division. A total of thirty applications were received for the job. Sixteen of the applicants were deemed eligible for the position and eleven of those eligible appeared for an oral test administered by a three-person oral board. That board was comprised of one white member, one black member and one Native American member. As a result of the test, the Board ranked plaintiff as second and Barbara Willis as fifth most qualified.

The Personnel Division used the "rule of five" in hiring, as do other State agencies. According to this process a list in order of ranking of the names of the five most eligible candidates for a position in state service is supplied to the department head who has the discretion to make the selection from the list submitted.

The evidence establishes that to be eligible for the position of Affirmative Action Officer an applicant must have possessed special qualifications. Prior to September 14, 1978, those qualifications were either graduation from high school and six years of experience in equal opportunity employment programs, or graduation from college plus four years of experience in equal opportunity employment programs. On that date, immediately prior to the time the job was advertised as open for application, a third basis for qualification was adopted by the State Personnel Advisory Commission upon the recommendation of the Personnel Division. It was three years experience in a professional capacity in comprehensive personnel management programs covering at least two of the following major functional areas: recruitment and examining; classification and pay; and training and productivity enhancement. Without this amendment to the eligibility requirements, Ms. Willis would not have been eligible even to apply for the position because she would have been unable to meet the requirements which existed for the position up to that time. Curiously, the added third eligibility basis does not in and of itself require experience in connection with affirmative action or equal opportunity programs, race relation experience, or any par-

ticular level of education. It is difficult to see how this third basis for eligibility touches on qualifications that would be necessary for a person to be an effective Affirmative Action Officer.

The record is barren as to the criteria used by the oral board in ranking the eligible candidates. Evidence does show that the questions asked by the oral board were "job related," intended to show knowledge about the job. Among other things the applicants were, for example, asked how they would handle a certain type of complaint of discrimination in employment.

In this case, defendant James Wittenberg, Director of Personnel for the State of Nevada and the department head of the Personnel Division, was the authorized appointing officer for the position. Dr. Carlos Romo, an Hispanic and first on the eligibility list, was offered the job by Mr. Wittenberg, but declined appointment. As a result, plaintiff then ranked first and Ms. Willis fourth on the list. Nevertheless, Mr. Wittenberg appointed Ms. Willis to be his division's Affirmative Action Officer.

At the time, Ms. Willis had been employed four years within the Personnel Division, as a personnel technician and as a personnel analyst. Mr. Wittenberg testified that Ms. Willis may have had experience in the informal handling of grievances involving complaints of racial discrimination. However, he knew of no formal responsibilities on her part in connection with the mediation of grievances. Her qualifications for work in equal opportunity employment and affirmative action were at best thin and highly doubtful. She was at the time she was hired for the job, and remains to the present day, virtually unknown to the minority community. Prior to being appointed, she had no credible record of ever having worked in any affirmative action or equal employment opportunity programs.

On the other hand, Mr. Cooper, the plaintiff, had extensive experience in the fields of race relations and equal opportunity work. During virtually all of his adult life he had been involved in problems of minority hiring, discrimination and affirmative action. He had on many occasions participated in the investigation and mediation of complaints of discrimination, including complaints of employment discrimination, both inside and outside state and federal government agencies. Further, Mr. Cooper had considerable experience in personnel type work while employed by the State Employment Security Department as an employment interviewer and placement officer. He was heavily involved in the leadership, organization and education of the minority community. Mr. Cooper had been active in resolving complaints of racial discrimination as early as 1951, when Ms. Willis was only five years old. Looking at background, experience and training, as reflected by the evidence now before the Court, Mr. Cooper appears to have been highly qualified for the job and Ms. Willis barely, if at all, qualified to hold the position.

The duties of the Affirmative Action Officer were outlined by Mr. Wittenberg. The Officer is to:

1. Analyze the work force;

2. Engage in outreach recruitment;

3. Meet with agency heads to work out strategies to improve racial parity;

4. Write affirmative action plans;

5. Monitor performance of agencies in reaching racial parity;

6. Work with agencies to meet guidelines outlined in the affirmative action plans;

7. Investigate and mediate complaints of discrimination;

8. Deal with complaints against agency heads;

9. Study patterns and practices of employment of particular agencies;

10. Work with employment examiners to revise examination procedures where recruitment results in below parity minority hiring;

11. Undertake outreach recruitment especially with the opening of new institutions and advise the minority community of job openings;

12. Undertake community relations with the minority community; and

13. Conduct education of the minority community.

These duties are generally outlined in the Nevada State Affirmative Action Plan.

The Affirmative Action Officer of the Personnel Division has no supervisory duties or staff. He does not have to be a testing expert or statistician.

There have been few blacks ever employed by the Personnel Division. The number of blacks so employed is as follows:

| | |
|---|---|
| 1973 | 1 |
| 1974 | 1 |
| 1975 | 1 |
| 1976 | 1 |
| 1977 | 1 |
| 1978 to August 13 | 1 |
| 1978 August 13 to August 19 | 2 |
| 1978 August 19 to year end | 1 |
| 1979 to January 29, 1979 | 1 |
| 1979 January 29 to June 4, 1979 | 0 |
| 1979 June 4 to October 3, 1979 | 1 |
| 1979 October 3 to year end | 0 |
| 1980 January 1 to March 23, 1980 | 0 |
| 1980 March 23 to April 2, 1980 | 1 |
| 1980 April 2 to April 9, 1980 | 2 |
| 1980 April 9 to year end | 3 |

At the present time, the Personnel Division employs two blacks. During the period 1973–80 there was only one black ever employed in a supervisory or management capacity. He held a middle management job as senior personnel analyst.

The total number of employees in the Personnel Division through the period 1977 to 1980 was approximately 55, of which 37 or 38 were employed in Carson City and the rest in Las Vegas. In 1978, the percentage of the general labor force in the State of Nevada at large which was black was 5.43%. There is no evidence as to what percentage of the labor force at large or the black labor force would have been able to meet any of the three minimum eligibility requirements for the subject position.

It is noteworthy that three of the eleven eligible qualified applicants for Affirmative Action Officer of the Personnel Division were black. They constituted 27% of the qualified applicants. This statistic is not surprising because of the extensive participation of blacks in affirmative action and equal opportunity programs in the State of Nevada over the past decade. As to qualified applicants for all positions within the Personnel Division from 1977 to 1980, seven out of one hundred twenty-eight, or 5.4%, were identified as black. Mr. Wittenberg and the attorney for the defendants both seemed to concede that 5.43% black employees in the Personnel Division would be parity for that division, so far as jobs with statewide responsibility are concerned. In the view of the Court these statistics indicate that the Personnel Division should have had three black employees to be employing a commensurate number of blacks to the available black work force eligible to hold jobs in the Division.

The Affirmative Action Officer for the Personnel Division of the State of Nevada acts statewide. There were several applicants from Las Vegas for this job. The salary and importance of the position were enough to attract people from all portions of the State.

Mr. Wittenberg testified that his decision to hire Ms. Willis was made on the bases of the outcome of the oral test, who could "best do the job", and past employment history and performance. These criteria were not weighted, nor were they written down. He admits they were subjective in that they could apply to any job for anybody in any place. Mr. Wittenberg said he was looking for someone who could deal with and relate to people because of the cross-section of people involved in performing the job, i.e., department heads, federal level officials, rank and file employees, and people in the minority community. He said he wanted a person who would be dependable, reliable, motivated and knowledgable of the laws and regulations applicable to employment practices.

Reviewing all of the evidence and record of this case the Court must conclude that, once Dr. Romo declined the position, Director Wittenberg intended to promote from within his own Division rather than to

hire from without. It is not known why Dr. Romo declined the position. Of the list of five eligibles provided by the board only one was from within the Division, and she was the one picked. There were no blacks eligible for this job within the Division. Hiring from within is suspect when the issue is discrimination in employment. This is especially so in a situation such as existed in the Personnel Division, that is, where the employees were virtually all white. Such a practice strengthens the inference of racial discrimination that arises where there is only token black representation in the employer's work force. *See Gay v. Waiters' and Dairy Lunchmen's Union,* 694 F.2d 531, 554 (9th Cir.1982); *O'Brien v. Sky Chefs, Inc.,* 670 F.2d 864, 867 (9th Cir.1982).

■ The ultimate burden of proof to show that the plaintiff was not selected for the job because of discrimination based on race rests with the plaintiff. *Gay, supra* at 537. In a disparate treatment case such as this the plaintiff had the burden of presenting a prima facie case of discrimination, *Ibid.,* which he did. Then it was up to the defendants to articulate legitimate non-discriminatory reasons as to why the plaintiff was not selected for the job. *Id.,* at 543. At that point the burden would shift back to the plaintiff to prove by a preponderance of evidence that the reasons given by the defendants were pretextual. *Texas Dept. of Community Affairs v. Burdine,* 450 U.S. 248, 253, 101 S.Ct. 1089, 1093, 67 L.Ed.2d 207 (1981).

■ The *Gay* opinion, at pp. 537–39, explains that the order and allocation of proof is essentially the same in § 1981, § 1983 and Title VII disparate treatment cases. Separate consideration of each claim for relief is not necessarily required, because the plaintiff is barred from obtaining a double recovery through his related claims. *Okonko v. Union Oil Company of California,* 519 F.Supp. 372, n. 5 (C.D.Cal.1981).

■ In order to establish a prima facie case of racial discrimination, a plaintiff is required to show:

1. That he is a member of a racial minority;

2. That he applied and was qualified for a job for which the employer was seeking applicants;

3. That, despite his qualifications, he was rejected; and

4. That the job remained open after plaintiff was rejected. *Gay, supra* at n. 5.

Clearly, plaintiff Cooper made a prima facie case meeting these requirements. The reason for requiring the plaintiff to present a prima facie case is to eliminate the most obvious non-discriminatory reasons that he was not hired, such as no job opening or that the applicant was not qualified for the job. *International Bro. of Teamsters v. United States,* 431 U.S. 324, n. 44, 97 S.Ct. 1843, n. 44, 52 L.Ed.2d 396 (1977); *Nanty v. Barrows Co.,* 660 F.2d 1327, 1332 (9th Cir. 1981). Here it is uncontested that there was a job opening and the evidence clearly indicates that the plaintiff was highly qualified for the opening. Once a prima facie case had been made, a rebuttable presumption arose that the failure to hire the plaintiff was because of discrimination. *Id.* at 1331.

Defendant Wittenberg then articulated legitimate non-discriminatory reasons why the plaintiff was not selected for the job. Mr. Wittenberg's testimony was that he talked with three of the plaintiff's former supervisors, namely Robert Archie, Robert T. Romine and Jesse C. Scott. He testified that they advised him that the plaintiff was unreliable, undependable and of questionable honesty. Further, Mr. Wittenberg said that they told him of serious problems arising from the plaintiff's womanizing activities while the plaintiff was a State employee. In addition, the plaintiff's performance was allegedly unsatisfactory. Mr. Wittenberg also testified that he had reviewed the plaintiff's State personnel file and found evidence of lack of supervisory ability, inability to get along with fellow employees, failure to keep appointments, the unauthorized closing of his office during business hours and so many personal phone calls that the plaintiff's productivity was adversely affected.

In following the required pattern of order and allocation of proof, once said defendant had articulated what appeared to be legitimate non-discriminatory reasons for the business decision, the burden shifted to the plaintiff to show, by a preponderance of the evidence, that these reasons were pretextual.

While misconduct may be a legitimate basis for refusal to hire, it is not a justification for racial discrimination. *See McDonald v. Santa Fe Trail Transp. Co.,* 427 U.S. 273, 283, 96 S.Ct. 2574, 2580, 49 L.Ed.2d 493 (1976). The burden of the plaintiff at this stage was to prove that the reasons proffered by the defendant were a mere ruse for accomplishing the discriminatory objective. *Wright v. Western Elec. Co., Inc.,* 664 F.2d 959, 965 (5th Cir.1981). This could be done either by proving that the defendant more likely was motivated by a discriminatory reason or by showing that his assertedly neutral basis for rejecting the plaintiff was so unworthy of credence that he could not honestly have relied on it. *See Douglas v. Anderson,* 656 F.2d 528, 534 (9th Cir.1981); *Lieberman v. Gant,* 630 F.2d 60, 65 (2nd Cir.1980). One way for a plaintiff to show that the reasons given by a defendant were merely pretext is to prove that the plaintiff was never seriously considered for the job opening. *See Nanty v. Barrows Co.,* 660 F.2d 1327, 1332 (9th Cir.1981); *E.E.O.C. v. Spokane Concrete Products,* 534 F.Supp. 518, 522–523 (E.D.Wash.1982). The plaintiff herein has sustained this burden.

Although applications for the position of Affirmative Action Officer were not invited until September 1978, Mr. Wittenberg relied wholly on the plaintiff's record of State employment, which ended in 1974. He made no inquiry as to what and how the plaintiff was doing during the 1974 to 1978 period.

As mentioned above, Mr. Wittenberg testified that he talked with three of the plaintiff's former supervisors when considering the plaintiff's 1978 application for the subject position. Two of them denied having been so contacted. Jesse C. Scott stated flatly, during his testimony, that he never was contacted by or spoke with Mr. Wittenberg about the plaintiff's application or his qualifications for the job of Affirmative Action Officer. Robert T. Romine's testimony was admitted in deposition form, since he was too ill to come to court. He stated that he did not remember any contact whatsoever with Mr. Wittenberg concerning the plaintiff. Further, he emphasized that he maintained a diary which surely would have contained a notation of any call received in 1978 from Mr. Wittenberg concerning Mr. Cooper. Mr. Romine searched his diary in vain for such an entry.

The ultimate focus of the Court's inquiry is whether the decision or action in question was racially premised, i.e., whether the reasons given for the plaintiff's rejection were in fact a coverup for a racially discriminatory decision. *Golden v. Local 55 of Int'l Assn. of Firefighters,* 633 F.2d 817, 821 (9th Cir.1980); *see also Furnco Construction Corp. v. Waters,* 438 U.S. 567, 577, 98 S.Ct. 2943, 2949, 57 L.Ed.2d 957 (1978). The plaintiff must prove a defendant's discriminatory intent, whether the claim for relief be based on § 1981, § 1983, Title VII disparate treatment, *Gay v. Waiters' and Dairy Lunchmen's Union,* 694 F.2d 531, 536–38 (9th Cir.1982), or § 1985. *General Bldg. Contractors Ass'n v. Pennsylvania,* —— U.S. ——, ——, 102 S.Ct. 3141, 3150, 73 L.Ed.2d 835 (1982). In order to prove the requisite intent, the plaintiff need not show that in any event he would have been rejected solely on the basis of his race; he is required only to show that race was a "but for" cause of his rejection. *McDonald v. Santa Fe Trail Transp. Co., supra* at n. 10. "Discriminatory intent" implies that the decisionmaker selected a particular course of action at least in part because of, and not merely in spite of, its adverse effects upon an identifiable group. *Gay, supra* at 552. To sustain his burden, the plaintiff need not have shown that race was the sole ground for the decision not to hire him—what he had to prove was that race was a determining factor in the decision; that is, that race made a difference in the sense that "but for" it, the defendant's conduct would have

been different. *See Olsen v. Southern Pac. Transp. Co.,* 480 F.Supp. 773, 779 (N.D.Cal. 1979), *aff'd w/o op.* 654 F.2d 733 (9th Cir. 1981).

■ There is no legal requirement or duty that an employer give preferential treatment to minorities. *Furnco Construction Corp. v. Waters, supra* at 577–578, 98 S.Ct. at 2949; *Texas Dept. of Community Affairs v. Burdine,* 450 U.S. 248, 259, 101 S.Ct. 1089, 1096, 67 L.Ed.2d 207 (1981). However, the discretion of an employer is to choose between *equally* qualified candidates, provided the decision is not based upon unlawful criteria. *Ibid.* In December 1978, when the defendant bypassed the plaintiff and chose Ms. Willis, the qualifications of the plaintiff were so facially superior that the defendant had an obligation to give him a full investigation. Instead, Mr. Wittenberg merely looked at personnel records covering the plaintiff's employment between 1970 and 1974 and spoke with one former supervisor. All qualified applicants are entitled to fair evaluation. *See E.E. O.C. v. Spokane Concrete Products,* 534 F.Supp. 518, 523 (E.D.Wash.1982).

■ As discussed above, the statistical evidence indicates that the Personnel Division consistently has fallen short in hiring blacks in numbers commensurate to their percentage of the available work force. The Court has given little probative value to the disparity, however, for special qualifications as to education and/or experience had to be met. *See Piva v. Xerox Corp.,* 654 F.2d 591, 596 (9th Cir.1981); *O'Brien v. Sky Chefs, Inc.,* 670 F.2d 864, 866–867 (9th Cir.1982). Yet, where, as in the instant action, independent evidence corroborates the hint of discrimination that arises from the observed disparity, the absence of statistical significance doesn't defeat the plaintiff's case. *See Williams v. City & Cty. of San Francisco,* 483 F.Supp. 335, 341–342 (N.D.Cal.1979). The Court should consider statistical data as evidence bearing on the issue of discriminatory intent, even though that data would be insufficient to prove anything standing alone. *Gay v. Waiters' and Dairy Lunchmen's Union, supra* at 550;

*see also McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 805, 93 S.Ct. 1817, 1825, 36 L.Ed.2d 668 (1973); *Lynn v. Regents of the University of California,* 656 F.2d 1337, n. 3 (9th Cir.1981).

The fact that Mr. Wittenberg's action was to promote from within, rather than to hire from without, under the circumstances where a non-black was certain to get the job, also supports an inference of racial discrimination. *See Gay, supra* at 554; *Nanty v. Barrows Co.,* 660 F.2d 1327, 1334 (9th Cir.1981).

In making the hiring decision Mr. Wittenberg deliberately ignored the fact that Ms. Willis had little, if any, visible knowledge of or contact with the very minority community she was supposed to be concerned with in the job of Affirmative Action Officer. Mr. Wittenberg himself seems only casually familiar with the Affirmative Action Plan of the Personnel Division. His personal contacts with the minority community are not extensive. He addressed one meeting of the Reno-Sparks chapter of the NAACP in 1978. Although he appeared to the NAACP members at that time to be receptive to their complaints and suggestions, in their view no apparent change in employment practices concerning blacks subsequently was manifested in the Personnel Division.

The failure of Mr. Wittenberg to investigate Mr. Cooper's job performance for the four-year period prior to his making application for the position of Affirmative Action Officer also strengthens the inference of racial discrimination since Mr. Wittenberg knew that Mr. Cooper was black.

The Washoe County Race Relations Center was in the business of trying to find jobs for blacks and other minorities. In this work it was able to make contact with and obtain cooperation from employers throughout the community. Despite efforts to do so, however, it was not able to maintain any such relationship with the Personnel Division, particularly as contrasted with the federal civil service. The federal civil service did contact the Race Relations Center when jobs were coming open, but the

Personnel Division did not do so. The widespread reputation of the State Personnel Division in the minority community is and has been that the Personnel Division does not have any particular interest in hiring blacks.

■ It is concluded from the foregoing that the decision not to consider seriously Mr. Cooper for the position of Affirmative Action Officer was based on intentional racial discrimination. He was deprived of an employment opportunity because of his race.

■ Compensatory damages, including mental and emotional distress caused by the denial of procedural due process, are recoverable under § 1983. *Vanelli v. Reynolds School Dist. No. 7,* 667 F.2d 773, 781 (9th Cir.1982); *see also Richardson v. Restaurant Marketing Associates, Inc.,* 527 F.Supp. 690, 697 (N.D.Cal.1981). Compensatory damages also are recoverable under § 1981. *Ibid; Shah v. Mt. Zion Hospital & Med. Center,* 642 F.2d 268, 272 (9th Cir. 1981). Mental suffering and emotional anguish are essentially subjective, but may be evidenced by one's conduct. *Carey v. Piphus,* 435 U.S. 247, n. 20, 98 S.Ct. 1042, n. 20, 55 L.Ed.2d 252 (1978). Mr. Cooper's testimony that he was "very disturbed" by his rejection is well supported by his frenetic conduct at the time. Within a week after receipt of a letter from the Personnel Division advising him that Barbara Willis had been selected for the job, he had filed a charge of discrimination with the Equal Employment Opportunity Commission and the Nevada Equal Rights Commission. He also sought to resolve the problem informally, by having the Equal Rights Commission speak to Mr. Wittenberg about providing him with a comparable job. Mr. Wittenberg never contacted Mr. Cooper, however. After receipt of a right-to-sue letter, this lawsuit was commenced.

The evidence is persuasive that the plaintiff was well aware that he never really had been seriously considered for the job, and that a determinative reason was his race. The feelings of frustration and outrage that Mr. Cooper experienced, and the distress and anguish that followed, were impressed upon the Court during the course of the trial. The evidence justifies an award of $10,000.00 to the plaintiff as and for general compensatory damages.

■ Once discrimination has been proved, in order for the defendants to avoid a remedy requiring them to give the plaintiff back pay and employ him in the job for which he was rejected or one similar thereto, the burden falls upon the defendants to prove by clear and convincing evidence that the plaintiff would not have been hired for the job even in the absence of discrimination. *League v. City of Salinas Fire Dept.,* 654 F.2d 557, 558 (9th Cir.1981); *Ostroff v. Employment Exchange, Inc.,* 683 F.2d 302, 304 (9th Cir.1982).

In analyzing whether there is clear and convincing evidence that the plaintiff would not have been hired, even absent illegal discrimination, it appears useful to compare the evidence of racial discrimination in this case against the evidence supportive of the reasons given by the defendants for not hiring plaintiff. *See Muntin v. State of Cal. Parks & Rec. Dept.,* 671 F.2d 360, 363 (9th Cir.1982).

A summary of the evidence of racial discrimination includes the long standing paucity of blacks both in the Department of Personnel and in its managerial ranks; action to promote from within rather than hire from without; Mr. Cooper's superior experience and background; Ms. Willis' lack of experience and contact with the minority community; Mr. Wittenberg's failure to fully investigate certain negative reports in the plaintiff's personnel file, so as to ascertain their validity; Mr. Wittenberg's failure to investigate at all Mr. Cooper's job history for the four-year period prior to December 1978; and the failure of the Division to maintain contact with the Washoe County Race Relations Center for the purpose of securing qualified black applicants for open state positions.

This litigation, and especially the trial, has provided the plaintiff with an opportunity to rebut the negative reports contained

in his State personnel file. It also has furnished incentive for the defendants to investigate their validity.

During the plaintiff's period of employment with the Nevada Employment Security Department he received "standard" employment performance evaluations throughout his tenure. The evidence indicates that he performed satisfactorily as an employee of that department. The only serious blemish on his record was that he was accused of harassing a woman in a trailer park in Sparks. He was driving a State car which he parked outside this woman's trailer. The incident resulted in a call to the Governor who in turn contacted Mr. Archie, the plaintiff's supervisor. Mr. Archie talked to Mr. Cooper and advised him that any continuation or recurrence of such conduct could jeopardize his job. This matter was mentioned in general terms as a part of one of plaintiff's employee performance evaluations. Mr. Cooper's explanation, in the view of the Court, is credible. He testified that he had made an occasional practice of having lunch at this lady's trailer during authorized lunch breaks. However, the trailer park manager was attempting to cause trouble because of resentment over Mr. Cooper's association with the manager's sister-in-law, who was white. This occurrence is scant support by itself for any conclusion that plaintiff would not be suitable to perform the job of Affirmative Action Officer for the Personnel Division. There is no indication that any such activity occurred again. In fact, sometime subsequent to the trailer park occurrence the plaintiff was transferred in State service from the Employment Security Department to the Nevada Equal Rights Commission at a higher civil service grade (32 as compared to grade 28 at the Employment Security Department) and at an increase in pay of about $100 a month.

The employment evaluations for plaintiff while with the Employment Security Department indicate only one other minor complaint and that was that he should endeavor to improve his work in the public relations area. It is to be noted that the trailer park incident and the suggestion that he should improve his work in relations with the public both occurred some seven years before Mr. Cooper applied for the job of Affirmative Action Officer. There is no evidence of any subsequent complaints about his performance based on the trailer park incident or any deficiency in public relations. When he was called by Mr. Wittenberg concerning the plaintiff obtaining the subject position, Mr. Archie in essence merely recounted the trailer park incident to Mr. Wittenberg.

Upon his transfer to the Nevada Equal Rights Commission, plaintiff assumed the position of Equal Opportunity Representative. The agency head of the Nevada Equal Rights Commission was Jesse Scott, Executive Director. In the position of Equal Opportunity Representative Mr. Cooper performed satisfactorily and received "standard" performance evaluations. He was confirmed as a permanent status employee and received a 5% merit salary increase. On September 17, 1973, he was promoted to Senior Equal Opportunity Representative, receiving a further increase in civil service grade and an increase in pay.

It appears that the Reno office of the Commission was manned by only two people, Mr. Cooper and a secretary, during some of the time Mr. Cooper was employed there. At other times the staff was augmented by at least one other Equal Opportunity Representative and another secretary.

On April 12, 1974, an individual with a claim pending before the Commission wrote to Jesse Scott as Executive Secretary, complaining of unwelcome sexual advances by plaintiff of herself and another person transacting business with Mr. Cooper in his official capacity. On June 12, 1974, after examining the matter, Mr. Scott issued a memorandum giving plaintiff thirty days to respond to the charges. There is nothing additional in the record to indicate the disposition of these charges. The letter and memorandum were both contained in Mr. Cooper's State personnel file, examined by Mr. Wittenberg in considering Mr. Cooper

for the appointment as Affirmative Action Officer. These charges were not included in the subsequent June 28, 1974, employment evaluation of plaintiff by Mr. Scott, nor in the findings of the State Personnel Advisory Commission, which reviewed plaintiff's subsequent demotion, as discussed below. It must be concluded that Mr. Scott and the Commission (if in fact it did consider these complaints) found no merit in these complaints.

On June 28, 1974, Mr. Cooper received a "below standard" employment performance rating from his superior, Mr. Scott, and was demoted from Senior Equal Opportunity Representative to Equal Opportunity Representative. The complaints about Mr. Cooper's performance contained in the June 28, 1974, employment evaluation were:

(a) That he was a poor supervisor. In this connection, as noted above, the position of Affirmative Action Officer for the Personnel Division does not carry any supervisory duties and the Affirmative Action Officer has no staff. This complaint thus would have no relevance to the later application for Affirmative Action Officer.

(b) That he demonstrated an inability to objectively rate a fellow employee. This type of function appears to fall under supervisory responsibilities and such a complaint would be irrelevant to the Affirmative Action Officer position. The Personnel Advisory Commission made no finding on this question as a result of its hearing.

(c) That the office secretary complained that she didn't get along with him. It does look as if there was a conflict of personalities between Mr. Cooper and the secretary. The secretary was unwilling to accept Mr. Cooper as supervisor of the office. There was a struggle as to who was going to be in charge of the office and at the worst demonstrated a weakness on plaintiff's part in exercise of supervisory responsibility.

(d) That he closed the Reno office of the Commission during business hours. The closing occurred at a time when the plaintiff was away from the Reno office on official business in Carson City and there was no other staff to keep the office open while the secretary took her lunch hour. It was on that basis that Mr. Cooper authorized the secretary to close the office for one hour. As soon as she received authorization to close the office to take her lunch hour, the secretary telephoned Mr. Scott to inform on Mr. Cooper for having closed the office. While it is clear the office should have been kept open in accordance with state regulations, again what Mr. Cooper did seems to fall into the category of whether or not Mr. Cooper was able to exercise supervisory authority properly.

(e) That disturbing telephone calls were received at the office from Mr. Cooper's wife. No finding on this issue was made by the Personnel Advisory Commission as a result of its hearing.

(f) That the plaintiff was forty-two minutes late for a staff training session and did not tell the truth about where he had been. As far as Mr. Cooper not telling the truth about why he was late, his testimony is credible that having previously checked out of his hotel, he went back to get his luggage and had a chance meeting with an acquaintance from Reno. The time went by faster than he realized as they chatted.

(g) That the plaintiff failed to see a Mr. Loomis, who desired to make an informal complaint of discrimination to the Commission. In the course of his work for the Commission Mr. Cooper took care of many, many complainants successfully and without difficulty. This one incident does not seem very strong evidence that he would not efficiently perform the job of Affirmative Action Officer. This occurred more than four years before the plaintiff's application for Affirmative Action Officer was filed. If you glean through the employment record of the very best employee you can probably turn up some such incident, if the employee has been active in pursuing his job.

It is important to note that Mr. Scott's recommendation in the June 28, 1974, evaluation was that Mr. Cooper be demoted but not that he be fired. In essence Mr. Scott recommended that Mr. Cooper no longer have supervisory duties. Mr. Scott felt that Mr. Cooper would be a satisfactory employee absent the duty to supervise.

It is also significant that while Mr. Wittenberg testified he called Mr. Scott concerning plaintiff's application to become Affirmative Action Officer, Mr. Scott testified that he had never been contacted by Mr. Wittenberg relative to that matter. It is uncontradicted, however, that Mr. Wittenberg did review the plaintiff's State personnel file and it contained the June 28, 1974, evaluation.

At the time of that evaluation, the recommendation for Mr. Cooper's demotion was also a determination that he was still deemed qualified to act as an Equal Opportunity Representative for the Commission, and able to satisfactorily discharge those duties. In most respects the duties of Affirmative Action Officer of the Personnel Division and Equal Opportunity Representative of the Nevada Equal Rights Commission appear to be quite similar. There do appear to be some additional duties delegated to an Affirmative Action Officer in dealing more directly with development of and execution of Affirmative Action plans. However, an Equal Opportunity Representative may well have also become involved in such plans.

After the demotion took effect, Mr. Cooper appealed to the Personnel Advisory Commission of the State of Nevada (PAC). He was afforded a hearing before that body. The demotion was affirmed by PAC. Findings in support of the decision were duly entered. Aside from its consideration of plaintiff's shortcomings contained in the June 28, 1974, employment evaluation, the Commission found:

(a) That the plaintiff testified falsely before the Commission and introduced fraudulent evidence.

(b) That the plaintiff exhibited an abrasive and abusive attitude and conduct toward subordinates and the general public.

(c) That the plaintiff was guilty of sexual harassment of the clerical staff.

The PAC decision was subsequently reviewed on an appeal to the Hon. Peter I. Breen, Judge of the Second Judicial District Court of the State of Nevada. It was Judge Breen's view that several of the claims of employment deficiencies of the plaintiff were weak. During the hearings before Judge Breen the State dropped the complaints of the alleged inability of the plaintiff to get along with the secretary and the objection to the telephone calls of Mr. Cooper's wife to the office. Further, Judge Breen found that the charge concerning the appointment with Mr. Loomis "was questionable and involved error on the part of both parties." Judge Breen also discounted the purported exercise of poor judgment by Mr. Cooper in rating a fellow employee. Nevertheless, the Judge found himself constrained by the laws applicable to review of administrative decisions to affirm the Commission's decision. He applied the criteria of substantial evidence, due process, and the clearly erroneous, arbitrary and capricious standard to the administrative proceedings and held that PAC's action should be affirmed.

Unhappy with his demotion, plaintiff left State employ in 1974. He obtained employment at the Veterans Administration as a mail sorting clerk, but lost that job. The reason given for his termination was that he made too many mistakes in sorting the mail. The plaintiff appealed to this United States District Court, contending that he had been discharged because he is black. District Judge Bruce R. Thompson affirmed the Veterans Administration's conduct, thereby rejecting Mr. Cooper's contention. The plaintiff then obtained employment with the Washoe County Race Relations Center as a Community Outreach Person. Since early 1980, he has been successful in his employment by the Washoe County Health Department as a Public Health Investigator.

■ The Court holds that the defendants have sustained their burden of proving, by clear and convincing evidence, that the plaintiff would not have been hired as the Personnel Division's Affirmative Action Officer even in the absence of racial discrimination. This finding is based on the following-described conduct of the plaintiff during his employment with the State, which is found to have occurred:

(a) The plaintiff testified falsely before the Personnel Advisory Commission and introduced fraudulent evidence;

(b) His abrasive and abusive attitude and conduct toward subordinates and the general public; and

(c) His sexual harassment of the clerical staff at the Nevada Equal Rights Commission.

The false testimony and evidence presented to the Commission may have been the result of an overzealous effort to win the Commission decision. Nevertheless, it reasonably could cause an employer to wonder whether such conduct would be repeated and whether the applicant was trustworthy. The Affirmative Action Officer position can be very stressful, for it deals with highly emotional controversies. The plaintiff's record under stress is a most serious mark against him.

■ An abrasive and abusive attitude and conduct toward subordinates and the general public would be characteristics quite undesirable for an Affirmative Action Officer. Although this attitude and conduct were not deemed a sufficient basis to discharge the plaintiff in Mr. Scott's June 28, 1974, employment evaluation, which directed the plaintiff's demotion, an inability to get along with the people with whom the applicant must work is a justifiable reason for not hiring him. *See Jamerson v. Bd. of Trustees of Univ. of Alabama,* 662 F.2d 320, 324 (5th Cir.1981).

The charge of sexual harassment of the clerical staff is very serious. The Affirmative Action Officer has no clerical staff, but no doubt must have clerical work to be performed and would therefore come in contact with some sort of clerical help or other, even though possibly indirectly. Such clerical staff may well include female workers. At the least, it strengthens the conclusion that the plaintiff would not have been hired even in the absence of racial discrimination.

Although the Department of Administration, State of Nevada and Howard E. Barrett, its director, have been named in the Complaint herein, no evidence of involvement or participation by either of them was introduced at the trial. Therefore, they are entitled to judgments of dismissal. *See Jackson v. Hayakawa,* 682 F.2d 1344, 1349 (9th Cir.1982); *Lokey v. Richardson,* 534 F.Supp. 1015, 1019 (N.D.Cal.1982).

In the same vein, no evidence of a conspiracy to interfere with the plaintiff's civil rights was presented at the trial. As a result, the claim for relief based on 42 U.S.C. § 1985 must be denied.

■ Nevada specifically has refused to waive its Eleventh Amendment immunity from suit in federal court. NRS 41.-031(3). This immunity also shields "arms" of the State, such as State agencies. *See Ginter v. State Bar of Nevada,* 625 F.2d 829, 830 (9th Cir.1980); *Lokey v. Richardson, supra* at 1019. The most important factor in determining if a particular agency is an "arm" or "alter ego" of the State for Eleventh Amendment purposes is whether payment of a judgment would have to be made out of the State treasury. *Hutchison v. Lake Oswego School Dist. No. 7,* 519 F.2d 961, 966 (9th Cir.1975), *vac. on oth. gds.* 429 U.S. 1033, 97 S.Ct. 725, 50 L.Ed.2d 744 (1977); *Rutledge v. Arizona Bd. of Regents,* 660 F.2d 1345, 1349 (9th Cir.1981). The Personnel Division has no funds with which to respond to a judgment for damages. It is completely dependent upon the State of Nevada, and is, therefore, immune from money damages, as well as injunctive relief, in this lawsuit. *See Ronwin v. Shapiro,* 657 F.2d 1071, 1073 (9th Cir.1981); *Edelman v. Jordan,* 415 U.S. 651, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974). It is, therefore, entitled to a judgment of dismissal on the ground of sovereign immunity.

A state official who acts in an unconstitutional or tortious manner may be held individually liable for monetary relief, however. *Aminoil U.S.A., Inc. v. Cal. State Water Res. Control Bd.,* 674 F.2d 1227, 1234 (9th Cir.1982); *Ronwin v. Shapiro, supra* at 1074. Defendant Wittenberg is liable to the plaintiff for the money damages awarded herein. This liability arises from the historical event here involved; namely, the 1978 decision not to consider seriously Mr. Cooper's application. *See Gay v. Waiters' and Dairy Lunchmen's Union,* 694 F.2d 531, 552 (9th Cir.1982); *Ward v. Westland Plastics, Inc.,* 651 F.2d 1266, 1270 (9th Cir.1980).

The issue of attorney's fees shall be deferred until an appropriate motion, with supporting documentation, is made therefor. *See Hutto v. Finney,* 437 U.S. 678, 98 S.Ct. 2565, 57 L.Ed.2d 522 (1978). For an interesting new precedent concerning this issue, *see Spain v. Mountanos,* 690 F.2d 742 (9th Cir.1982).

This Memorandum Decision shall constitute the Court's findings of fact and conclusions of law.

The Clerk of Court shall enter judgment dismissing the action as against defendants Division of Personnel, State of Nevada, Department of Administration, State of Nevada, and Howard E. Barrett, individually and in his official capacity as Director of the Department of Administration.

The Clerk of Court shall enter judgment in favor of the plaintiff and against defendant James F. Wittenberg in the sum of $10,000.00.