**CHICANO POLICE OFFICER'S ASSOCIATION et al., Plaintiffs-Appellants,**

**v.**

**Robert V. STOVER, Chief of Police, Albuquerque Police Department, et al., Defendants-Appellees.**

No. 74–1169.

United States Court of Appeals, Tenth Circuit.

Argued Oct. 24, 1974.

Decided Nov. 20, 1975.

Rehearing and Rehearing En Banc Denied Jan. 14, 1976.

Ray M. Vargas, Albuquerque, N. M. (Richard C. Bosson, Albuquerque, N. M., Vilma S. Martinez, Sanford Jay Rosen and Drucilla S. Ramey, San Francisco, Cal., and Joseph R. Grodin, San Francisco, Cal., of counsel, University of California Hastings College of Law, on the brief), for plaintiffs-appellants.

William S. Dixon, Albuquerque, N. M. (Frank L. Horan, City Atty., and Rodey, Dickason, Sloan, Akin & Robb, P. S., and Duane C. Gilkey, Albuquerque, N. M., on the brief), for defendants-appellees.

Before SETH, HOLLOWAY and DOYLE, Circuit Judges.

HOLLOWAY, Circuit Judge.

This civil rights suit challenges both the hiring and promotion procedures of the Albuquerque, New Mexico, Police Department (the Department) as racially discriminatory against Spanish-speaking and surnamed Americans. The plaintiffs are twelve Chicano employees of the Department and the Chicano Police Officer's Association (the Association).[1] The defendant Stover is the Chief of Police of the Department and the other defendants are the City Commissioners and City Manager of Albuquerque.

The complaint essentially alleged that the defendants had deprived plaintiffs, under color of State law, of rights, privileges and immunities secured by the constitution and laws of the United States in violation of 42 U.S.C.A. §§ 1981, 1983 and 1985 (R. I, 9). The complaint averred that defendants employed hiring and promotion procedures including tests and other job criteria which are not substantially related to job performance and have the effect of excluding a disproportionate number of Chicanos from employment and promotions in the Department, thus violating rights secured by the equal protection clause; by 42 U.S.

C.A. §§ 1981, 1983 and 1985, and other statutes. Jurisdiction was claimed under 28 U.S.C.A. § 1343(3) and (4), and declaratory and injunctive relief were sought.

After presentation of the plaintiffs' evidence, and that of two defense witnesses heard out of turn, defendants moved to dismiss under Rule 41(b), F.R. Civ.P., on the ground that plaintiffs had shown no right to relief. The trial court made written findings and conclusions adverse to the plaintiffs and dismissed.

On appeal plaintiffs argue principally that the trial court erred in that:

1. The court erred in holding that plaintiffs lack standing to challenge the hiring or entry level procedures of defendants; and

2. It was error to find and conclude that plaintiffs had made no *prima facie* case of the unlawfulness of the promotion procedures used by defendants.

We turn to the findings and conclusions of the trial court which are of critical importance.

I

## The Trial Court's Findings and Conclusions

The trial court made these findings: The Chicano Police Officer's Organization is an unincorporated association composed chiefly of Spanish-speaking or Spanish surnamed police officers in the Albuquerque Police Department. Its membership is not limited to Spanish-speaking or Spanish surnamed officers and not all such officers are members of the Association. The Association seeks to achieve equal opportunity for Spanish-speaking or surnamed Americans in recruitment and promotions within the Department, and to discourage discrimination.[2]

---

1. Throughout this opinion we will use the term "Chicano" to designate the racial minority of Spanish-speaking and Spanish surnamed Americans whom the suit concerns.

2. Plaintiffs' exhibit 1, a brochure of the Association, states that the Association's aims include, *inter alia*:

STATEMENT OF PURPOSE

The Chicano Police Officers Association also known as the Concerned Police Officers Association is dedicated to the following principles and purposes:

\* \* \* \* \* \*

The court found that no member of the Association and no plaintiff has been denied employment with the Department.

The court found further that police officers must be high school graduates or have obtained a general equivalency degree. The Department's General Order 71–23, issued December 17, 1971, requires that all officers to be promoted after January 1, 1972, must have completed at least six semester hours of college accredited study. Those to be promoted during 1974 were required to have completed twelve semester hours, and an additional six hours credit per year is required until a bachelor's degree is attained.

Promotional examinations were held on June 2, 1973. Four individual plaintiffs were ineligible to take the examination because they lacked the six hours of college credit. The court found, however, that there was ample notice and opportunity for completion of the six hour requirement prior to its application precluding officers from taking the examination. There had been an incentive pay of $1 per month for each hour of college credit, and from April, 1973, to June, 1973, 208 officers of the Department received incentive pay. Fifty-three of approximately seventy Spanish-speaking or surnamed officers received incentive pay under the program. 155 of approximately 305 Anglo officers received incentive pay. It was found that this demonstrates that 75% of the Spanish-speaking/surnamed officers attended college during the period and that the educational requirement did not erect a barrier for a minority group and that the requirement did not have a discriminatory effect on Chicanos as a group.

The results of the June 2, 1973, examination were summarized by the court as follows:

A. Sergeant's Examination:

| | |
|---|---|
| 1) Total Examinees | 90 |
| Passing Examinees | 17 |
| Percentage Passing | 19% |
| 2) Spanish-surnamed Examinees | 26 |
| Passing Examinees | 3 |
| Percentage Passing | 11.5% |

B. Lieutenant's Examination:

| | |
|---|---|
| 1) Total Examinees | 44 |
| Passing Examinees | 7 |
| Percentage Passing | 16% |
| 2) Spanish-surnamed Examinees | 7 |
| Passing Examinees | 1 |
| Percentage Passing | 14% |
| 3) Non-minority Examinees | 36 |
| Passing Examinees | 5 |
| Percentage Passing | 14% |

No Spanish-surnamed Americans took the June 2, 1973, examination for captain. The examinations were achievement tests and their subject matter was taken from tests on police administration, management, psychology, leadership and planning. Members of the Chicanos Police Officer's Association formed a study group. Some were assigned responsibility for outlining portions of the assigned texts. Several officers read some but not all of the texts and relied on outlines for the material they did not read. The June 2, 1973, examination had not been used before and is not to be used in the future.

2. To achieve equal opportunity in recruitment, promotion, assignment, evaluation, and other areas within all Police Departments.

\*  \*  \*  \*  \*  \*

6. To actively support the recruitment of personnel for police work in such a manner as to insure proportionate representation within the profession of all cultural and ethnic groups of the population of our community.

7. To encourage racial and ethnic harmony within the profession, as well as between the profession and the community and to discourage racism and discrimination.

\*  \*  \*  \*  \*  \*

10. To expand our knowledge of the various cultures and heritages of other people and to educate other members of the police profession on our own culture.

The court concluded that no plaintiff has standing to contest the hiring policies of the Department. The injury alleged by the Association and one individual plaintiff is that development of the power to negotiate for the betterment of the position of Chicanos is stifled by policies perpetuating under-representation of the Spanish minority on the police force. It was concluded, however, that the relief sought would not directly benefit the Association, and that the Association and its members have only an indirect stake in the outcome and are not entitled to assert the rights of those directly affected and not present in the suit.

The court concluded that the plaintiffs have failed to establish *prima facie* that the college educational requirement adversely affects minority groups. It concluded that the plaintiffs failed to show that the promotional examinations caused a statistically significant discriminatory impact on Spanish-speaking/surnamed officers. The overall pass ratio for each examination was small. 19 percent passed the sergeant's examination; 16 percent passed the lieutenant's examination. The ratio of Spanish-surnamed passing to non-minority passing was one to one on the lieutenant's examination and slightly less than two to one on the sergeant's examination.

The 11 percent pass rate for Spanish-speaking/surnamed examinees for sergeant is arrived at from a small sample, since only 26 Spanish-speaking/surnamed were eligible to take the examination. Three of the 26 passed. The trial court held that the 11 percent figure is not stable or highly reliable. A variance of two Spanish individuals passing or failing would yield ratios between five to one and one to one.

The court concluded that any significance the two to one ratio might have is undermined by the testimony. There was no showing that any other examinees were able to pass with equal or less preparation. Thus, the court concluded that it cannot be said that the disparity in pass rate is statistically significant.

The court concluded further that the plaintiffs have shown no right to relief. It was observed, however, that had they made a *prima facie* showing of a discriminatory impact of the tests, the defendants probably could not have carried their burden of persuasion; that defendants need to improve recruitment and promotion policies to alleviate under-representation of the Spanish minority at all levels of the Department; that the heavy reliance placed on the achievement type test seems inequitable and misplaced; and that the test does not go far enough in showing performance, leadership and supervisory ability.

The court said further that the value and reliability of the present promotional scheme was dubious, but that the evidence has not shown the significant adverse impact on minorities which is necessary to support an injunction or imposition of a court-ordered remedial plan. And the court stated that immediate steps should be taken to solve these problems and eliminate ". . . what could become a breeding ground for future litigation."

On these findings and conclusions the court dismissed with prejudice.

## II

### *Standing to Challenge The Entry Level Hiring Procedures*

First, plaintiffs argue that the trial court erred in holding that no plaintiff has standing to challenge the hiring policies of the Department. As stated, the court reasoned that the injury alleged by the Association and one officer is that the development of power to negotiate for the betterment of the position of Chicanos is stifled by policies perpetuating under-representation of Chicanos. However, the court concluded that the Association and its members have only an indirect stake in the outcome and are not entitled to assert the right of those directly affected and not otherwise present in the suit—persons unsuccessfully seeking employment or discouraged from doing so.

■ We must, of course, observe the requirements for standing which have a constitutional starting point in Article III. *Warth v. Seldin*, 422 U.S. 490, 498, 95 S.Ct. 2197, 45 L.Ed.2d 343; *Data Processing Service v. Camp*, 397 U.S. 150, 152, 90 S.Ct. 827, 25 L.Ed.2d 184. The plaintiffs must show that the challenged action has caused them injury in fact, economic or otherwise, and that the interest they seek to protect is arguably within the zone of interests to be protected or regulated by the statute and the constitutional guarantee in question. Id. at 152–53, 90 S.Ct. 827; *United States v. SCRAP*, 412 U.S. 669, 686–90, 93 S.Ct. 2405, 37 L.Ed.2d 254. They must have a personal stake in the outcome. *Warth v. Seldin*, supra, 422 U.S. at 499, 95 S.Ct. 2197. This requirement is to insure that concrete adverseness which sharpens presentation of issues on which the courts depend for illumination of difficult constitutional questions. *O'Shea v. Littleton*, 414 U.S. 488, 493–94, 94 S.Ct. 669, 38 L.Ed.2d 674; *Baker v. Carr*, 369 U.S. 186, 204, 82 S.Ct. 691, 7 L.Ed.2d 663.

■ Nevertheless, the standing requirement is not to be applied to defeat constitutional claims. An "identifiable trifle" is enough for standing to fight out a question of principle; the trifle is the basis for standing and the principle supplies the motivation. *United States v. SCRAP*, 412 U.S. 669, 689, n.14, 93 S.Ct. 2405, 37 L.Ed.2d 254.

In our case we have both individual plaintiff Chicano officers and the Association. This is not, however, a class action maintained for others.[3] The plaintiffs allege that by denying to them and other Chicano citizens the benefits of being hired and promoted—which denial is on the basis of invalid tests and criteria having no substantial relationship to job performance—the effect is to exclude a disproportionate number of Chicano citizens in violation of the equal protection clause and various statutes. The affidavit of Mr. Chavez supports the general claims made, stating that in working with the Department for fair treatment of Chicanos and other minorities, the Association must have the support of as many Chicanos as possible; that only if it represents a substantial number of policemen can they negotiate effectively with the Department from a position of strength; that discrimination against Chicanos in recruitment and hiring dilutes the strength of the Association and directly affects its effectiveness; and that Chavez is personally affected in his attempts to change the system by the effect of what he believes to be discrimination against Chicanos in the entrance procedures of the Department.

■ We are satisfied that both the Association and the individual plaintiffs made a sufficient showing of standing. This was demonstrated, we feel, by undisputed proof and reasonable and obvious inferences. The Association had 44 signed members at the time of trial (Nov. 26, 1973), and about 50 members in all (Tr. 82). Of these only one or two were Anglos. Id. In the period from April to June, 1973, the court's findings state that there were approximately 70 Spanish-speaking/surnamed officers and approximately 312 Anglos officers on the force (see Finding 23). Thus, from the proof it is clear that a substantial portion of Chicanos obtaining employment on the force joined the Association. The Association therefore has a direct stake, independent of its members' rights under the Civil Rights Act, in challenging barriers against employment of those from whom it might well enhance its membership and resources to attain its goals. *Warth v. Seldin*, supra, 422 U.S. 511, 95 S.Ct. 2197; *Albany Welfare Rights Organization v. Wyman*, 493 F.2d 1319, 1322 (2d Cir.).

We are also satisfied that the proof made a sufficient showing of standing of

---

3. This makes inapposite the class action cases relied on by plaintiffs which support the "across the board" theory permitting one plaintiff to challenge all discriminatory practices of an employer. We do not reach this theory in our disposition.

the individual plaintiffs to challenge the hiring procedures. There is recognition of secondary effects on others as a valid basis for standing in several instances. In *Marable v. Alabama Mental Health Board*, 297 F.Supp. 291, 297–98 (M.D. Ala.), the court upheld the standing of individual mental patients for themselves and for a class to challenge the discriminatory hiring practices affecting staff personnel of the institution where they were located. The court reasoned that the secondary effects of discrimination on the plaintiffs as patients entitled them to challenge the hiring procedures relating to the staff personnel. Ibid. In like manner the standing of students to challenge the discriminatory policies of teacher assignments has been sustained on the rationale that the removal of a discriminatory educational system and the achievement of a non-racially operated system afforded standing rights to individual plaintiffs. *Lee v. Macon County Board of Education*, 267 F.Supp. 458, 472–73, 478 (M.D.Ala.), aff'd *sub nom. Wallace v. United States*, 389 U.S. 215, 88 S.Ct. 415, 19 L.Ed.2d 422.

■ Moreover, this court recently affirmed a similar order for transfer of school officials, recognizing implicitly the standing of individual students to assert the invalidity of discriminatory personnel policies affecting others because the policies had a secondary effect on the students. See *Dowell v. Board of Education of the Oklahoma City Public Schools*, Unpublished Order (10th Cir., January 31, 1975), cert. denied, 423 U.S. 824, 96 S.Ct. 37, 46 L.Ed.2d 40 (1975). The fact that harm from discriminatory hiring policies is imposed directly on the rejected or discouraged applicant does not deprive the present Chicano officers of standing to challenge the hiring prac-tices that are asserted to produce an under-representation of Chicanos on the force. The indirectness of the injury to the employees does not necessarily deprive them of standing to vindicate their rights. See *Warth v. Seldin*, supra, 422 U.S. 504–05, 95 S.Ct. 2197, and to seek removal of the taint of racial discrimination from the work force.[4]

In sum, we are satisfied that both the Association and the individuals made a sufficient showing of standing to challenge the allegedly discriminatory hiring policies and, of course, there is no indication of a lack of concrete adverseness between the position the plaintiffs take and that of defendants. See *Baker v. Carr*, 369 U.S. 186, 204, 82 S.Ct. 691, 7 L.Ed.2d 663. It follows that we must hold that the court was in error in its findings and conclusions denying standing to plaintiffs to challenge the entry level hiring procedures.

## III

### *The Trial Court's Ruling that no Prima Facie Case was made by Plaintiffs*

Plaintiffs' second argument on appeal is that the trial court erred in holding that plaintiffs had not made out a *prima facie* case against the promotion level procedures and in dismissing their claim for relief from such allegedly unlawful procedures. More specifically plaintiffs say the court erred (1) by excluding evidence relating to prior examinations; (2) by concluding plaintiffs had not established a *prima facie* case on the evidence presented; (3) by ignoring, as a consequence of its rulings as to standing, the relationship between promotions and discriminatory hiring practices; and (4) by dismissing their showing as not statistically significant because any significance

---

**4.** There is a substantial factual basis for the claim that discrimination exists at the entry level. The evidence of under-representation throughout the police force appears in Part III, infra. Additional evidence reflects a racial disproportionality in the results of entrance examinations administered by the defendants be-tween 1971 and 1973. Based upon a large sampling of examinees, it appears that the pass rate among Spanish-surnamed Americans was approximately 43.2% for the years 1971 through 1973, while the non-Spanish-surnamed Americans passed at a 78.9% rate; a pass rate ratio of 1.83:1. (Exhibit 2; R. 328).

of the slightly less than two to one ratio on the sergeant's test was undermined by the testimony.[4a] (Brief of Plaintiffs-Appellants at 27, 34).

*First*, we feel the exclusion of the prior examinations poses a serious question. Plaintiffs offered proof of the results of examinations *from 1966 to 1971* (Plaintiffs' Exhibits 7–12). Objections were made on the ground of relevancy to these exhibits, defendants arguing that an intervening and different examination was now being given and that the results of the old examinations were irrelevant (See Tr. 49, 53, and the various objections at 49–60). Other objections are said to have been urged and are now argued on appeal to support the exclusion of the exhibits (Answer Brief of Defendants-Appellees at 12–15). We read the record to have raised only relevancy and must assume this was the basis for the trial court's exclusion of the proof.[5]

█ We agree with the view that the measure of a claim under the Civil Rights Act is in essence that applied in a suit under Title VII of the Civil Rights Act of 1964. *Chance v. Board of Examiners*, 458 F.2d 1167, 1175–76 (2d Cir.); see *Sabol v. Snyder*, 524 F.2d 1009, 1012 (10th Cir. 1975). Relief may be had from artificial, arbitrary and un-

necessary barriers to employment when they operate invidiously to discriminate on the basis of racial or other impermissible classifications. *Griggs v. Duke Power Co.*, 401 U.S. 424, 431, 91 S.Ct. 849, 28 L.Ed.2d 158. While the employer's intent may be examined, *Griggs* supra at 432, 91 S.Ct. 849, the plaintiff needs only to show that the challenged procedures have a discriminatory result, *Griggs*, supra at 432, 91 S.Ct. 849. This showing would make out a prima facie case, requiring the employer to demonstrate that his employment criteria or tests were validly job-related. *Spurlock v. United Airlines, Inc.*, 475 F.2d 216, 218 (10th Cir.); *Chance v. Board of Examiners*, supra, 458 F.2d at 1176.

█ Obviously, the scope of proof must be broad to establish such a *prima facie* case. It is open to the plaintiff to develop proof of the general overall trends in hiring and promotion policies. See *Rich v. Martin-Marietta Corp.*, 522 F.2d 333, at 343, 345 (10th Cir. 1975), and this may necessitate "a backward glance. . . ." *EEOC v. University of New Mexico, Albuquerque*, 504 F.2d 1296, 1304 (10th Cir.). In our type of case we must agree with the view in *Chance v. Board of Examiners*, 458 F.2d 1167, 1171 (2d Cir.), where examinations given during several past years to large numbers of applicants were considered.[6]

---

**4a.** Although not explicitly set out in the findings, the two to one pass rate ratio derived by the court is apparently the correct statistical comparison of the pass rate of non-minority examinees to the pass rate of the minority examinees. See *Bridgeport Guardians, Inc. v. Members of Bridgeport Civil Service Commission*, 482 F.2d 1333 at 1335, n.3 (2d Cir. 1973), cert. denied, 421 U.S. 991, 95 S.Ct. 1997, 44 L.Ed.2d 481 (1975); see also cases cited therein.

**5.** There was no express ruling on the objection. However the trial court's detailed findings treat only the latest promotional examinations given on June 2, 1973, and it is apparent that the court did not weigh the earlier examinations in its considerations.

On the further trial for which we are remanding, the trial court may, of course, consider authenticity or other objections timely

made and the defendants may develop the weaknesses which they say exist as to the exhibits covering past years.

**6.** We note that a compilation of prior test results was relied upon in *Bridgeport Guardians*, supra, 482 F.2d at 1335 (five years of entrance exams; twelve years of promotional exams were admitted, although for some reason the court did not compile the statistics on the promotional exams), see 354 F.Supp. 778 at 795; in *Chance v. Board of Examiners*, 330 F.Supp. 203 at 209 (S.D.N.Y.1971) aff'd, 458 F.2d 1167 (2d Cir. 1972) ("50 supervisory examinations given over the past few years."); in *Commonwealth of Pa. v. O'Neill*, 348 F.Supp. 1084 at 1101 (E.D.Pa.1972) aff'd, 473 F.2d 1029 (3d Cir. 1973) (three written promotion exams given between 1968 and 1970); and in *Harper v. Mayor and City Council of Baltimore*, 359 F.Supp. 1187 (D.Md.1973) modified sub nom.

Defendants argue that the prior tests were different from those given on June 2, 1973.[7] However, if such an objection were sustained an employer could always say that he regularly changes examinations and thus insulate unlawful practices from scrutiny.[8] We cannot agree with defendants' theory and instead feel that prior procedures, at least for the years here offered, were relevant.

The question of relevance and of remoteness of exhibits in time is, of course, generally within the discretion of the trial court. Here, however, we are satisfied that the proof offered was clearly within a reasonable time frame and should not have been rejected as irrelevant. In this connection we note that such proof need not show a racially disproportionate impact with mathematical nicety; its purpose is initially to premise a finding whether a *prima facie* case is made; such a finding does not decide the case and instead only places the burden on the defendant to justify the testing criteria in question. *Vulcan Society of the New York City Fire Department v. Civil Service Commission of the City of New York*, 490 F.2d 387, 393 (2d Cir.).

In the circumstances before us we feel rejection of the exhibits of these plaintiffs as irrelevant was error.

*Second,* plaintiffs argue the trial court erred in dismissing the 2 to 1 ratio as statistically insignificant because of the smallness of the sample and undermining of its significance by the testimony (Brief of Plaintiffs-Appellants at 34). They are pointing to the Court's conclusion that they failed to show that the promotional examinations caused a statistically significant discriminatory impact on Spanish-speaking/surnamed officers, and that "there was no showing that any other examinees were able to pass with equal or less preparations." (R. 290).[9]

We must disagree with the ultimate findings and conclusions of the trial court. The smallness of the sample should not be grounds here for rejecting the proof. If it were, the tendency would be to deny employees in small plants the type of protection the civil rights statutes afford. Moreover, here the inability to evaluate the test effects on a larger scale resulted in large part from the exclusion of the results of the several prior examinations. And, in any event, we feel the group tested was not too small to be evaluated as significant. See *Brito v. Zia Co.,* 478 F.2d 1200, 1205 (10th Cir.).

Moreover, we note that although the court found that no *prima facie* case was made, it was observed that:

> Defendants need to improve recruitment and promotion policies in order to alleviate the underrepresentation of the Spanish minority at all levels of the department (R. 291).[10]

*Harper v. Kloster*, 486 F.2d 1134 (4th Cir. 1973) (the court considered exam results from 1971, 1963, 1960, 1957 and 1956, 5 exams), see 359 F.Supp. at 1198–99.

**7.** The trial court found that the examinations given on June 2, 1973, had not been given before and are not to be given in the future (R. 289).

**8.** We assume that an employer would regularly change at least the specific questions on examinations to avoid them becoming simply a memory exercise to recall answers to available prior tests.

**9.** There was some testimony that the Chicano group assigned reading of books to certain persons and relied on review of outlines prepared by them (R. 94–95, 158–59).

**10.** The record in the present case reflects a statistical discrepancy between the Chicano population of Bernalillo County, and the Chicano representation in the Albuquerque Police Department. The Chicano population of Bernalillo County is approximately 39.2% (Exhibits 26, 27; R. 471, 472). The statistical breakdown of the Albuquerque Police Department as of August, 1973, based on testimony of plaintiffs' witness is approximately as follows:

|  | No. | % |
|---|---|---|
| Chicano | 86 | 21.4 |
| Non-Chicano | 316 | 78.6 |
| Total | 402 | 100.0 |

(Tr. 643).

Although the Chicano population of the county is approximately 39.2%, only 21.4% of

■ In view of the facts concerning the small Chicano representation, as well as the errors which we are persuaded occurred, we are convinced we should set aside the findings and conclusions and remand for a new hearing and reconsideration.

There remains the trial court's reference to the lack of a showing that "any other examinees were able to pass with equal or less preparation." (R. 290), an apparent allusion to the testimony that outlines prepared by others, and not the text books, were studied by the Chicano officers.

■ We have noted no authority supporting the imposition of such a burden on the plaintiff. If the proof surrounding a test showed a lack of a good faith effort by minorities to pass, we do not say this factor should be ignored. But in this case we feel the burden imposed was unjustified in connection with a showing for a *prima facie* case. Our conclusion here is re-enforced when we recall the trial court's unfavorable observations concerning the type of tests used:

> The heavy reliance placed on the achievement type test seems inequitable and misplaced. It does not go far enough in showing performance, leadership and supervisory ability. (R. 291).

It seems illogical to say the type of test was improper and at the same time to hold the *prima facie* showing of plaintiffs was defective because they did not prove that any other examinees were able to pass such tests with equal or less preparation.

Other arguments are made by the parties but we need not discuss them. What we have said shows our reasons for concluding that errors in the standing determination on the entry level issue as well as in the treatment of the promotional level proof require a retrial. Accordingly, the findings, conclusions and judgment are vacated and the case is remanded for further proceedings.

## On Petition for Rehearing

This matter comes on for consideration of the petition filed by defendants for rehearing together with a suggestion that there be a rehearing en banc.

Upon consideration whereof, we conclude that the rehearing should be denied and it is ordered denied. No judge having requested a poll on the suggestion for rehearing en banc, that suggestion is denied. Rule 35(b), Federal Rules of Appellate Procedure. Our reasons follow:

*First*, defendants argue that the opinion is at odds with *Warth v. Seldin*, 422 U.S. 490, 95 S.Ct. 2197, 45 L.Ed.2d 343, saying that neither the Association nor the individual plaintiffs have shown injury to themselves sufficiently to meet the requirements of *Warth*, and that they may not assert the rights of third parties.

The opinion details the showing of standing we feel sufficient under *Warth*. We need only emphasize that there is an adequate showing, we feel, of a personal stake by the Association and individuals to challenge the hiring policies. *Warth*, supra at 499, 95 S.Ct. 2197. The Association, as indicated by the evidence, see note 1 of the opinion, seeks to encourage racial harmony and to discourage racism and discrimination. The underrepresentation of Chicanos on the police force, see notes 4 and 10 of the opinion, would have an obvious effect in restricting membership and resources available to the organization for furthering these purposes

---

the police force is Chicano. The malapportionment becomes more significant when the police force is broken down by rank. None of the police captains are Chicano; only 4.5% of the police lieutenants are Chicano; (i. e. one out of twenty-two); 18.3% of the police sergeants are Chicano; and 31% of the patrolmen are Chicano (Exh. 13, R. 398, Tr. 641). It

is apparent that the representation of Chicano within the police department as a whole diminishes at the higher rank; that the bulk of the Chicanos are employed at the lower levels. At every level of the Department, however, the Chicano population of Bernalillo County is under-represented.

(Plaintiffs' Exhibit 1; affidavit of Frank Chavez, R. Vol. I, 202, stipulated into evidence subject to objections, id. at 194). The. individuals make a similar showing of injury to themselves due to the effect of discrimination on the workforce. The proof was that restriction of Chicano employment by discriminatory entrance · procedures weakened both the Association and individual efforts to change promotion policies (Affidavit of Frank Chavez, R. Vol. I, 202).

We are convinced that for standing purposes injury to the Association and individuals is sufficiently shown in connection with composition of the workforce, and the fact that specific harm occurs to third parties not hired does not deprive these plaintiffs of standing to vindicate their own rights. *Warth*, supra at 504–05, 95 S.Ct. 2197.

*Second*, defendants turn to the opinion's treatment of the trial court's ruling that a prima case was not made to challenge the promotion level procedures. In part they challenge our holding that it was error for the trial court to exclude as irrelevant the proof concerning the prior examinations from 1966 to 1971 (Plaintiffs' Exhibits 7–12).

Defendants say that reversal is not warranted because in addition to the relevancy objections, they made renewed objections raising the grounds of errors in tabulation, erroneous conclusions and authentication, citing record objections in Vol. VI, at 116 and 119. It is clear, however, that these other objections were directed to other exhibits, that is Exhibits 3 and 4, and not to the examinations in question (R. VI, 108, 116, 119).

Defendants argue also that even if the trial court erroneously excluded the ex-

hibits as irrelevant,[1] there were other tenable grounds for exclusion—lack of authentication, compilation errors, et cetera, so that the ruling should not be reversed, citing Hamling v. United States, 418 U.S. 87, 108 n. 10, 94 S.Ct. 2887, 41 L.Ed.2d 590, *inter alia.*

Without considering whether such rule would apply here, this record convinces us that rejection of all the proof of prior examinations cannot be sustained here. The trial court admitted, without objection, plaintiffs' summary of the 1973 examinations, Exhibit 14, containing tabulations made apparently in the same way and by the same witness, Mr. Chavez (R. V, 63; VI, 144), whose tabulations for the other exhibits covering the prior examinations are challenged as inaccurate, et cetera. Exhibit 14 was apparently accepted and relied on by the trial court whose findings cite Chavez' figures (R. I, 288). Thus it would be unfair here to say that the other grounds of objection to Exhibits 7–12 concerning the prior examinations—such as unreliability and the like—existed and were "tenable."

The prior examinations were not mentioned in the findings or conclusions of the trial court and there was no express ruling on the relevancy objections made. The 1973 examination was discussed in detail. We are satisfied that the exhibits concerning the earlier examinations were excluded from consideration by the trial court as irrelevant, and that this is the only tenable ground to consider in the posture of this appeal. And regardless of whether the exhibits were excluded as irrelevant, or considered unreliable and wholly discounted, we are convinced we cannot sustain the failure to give any consideration to them.

---

1. Defendants also contend that we should presume that the exhibits were actually considered and discounted as unreliable. (See Petition for Rehearing, 13).