727 F.2d 167
 PEOPLE ORGANIZED FOR WELFARE AND EMPLOYMENT RIGHTS
(P.O.W.E.R.), Walter Tunis, and Clarence Propst,
Plaintiffs-Appellees,
v.
James R. THOMPSON, Governor of the State of Illinois,
Jeffrey C. Miller, Director of the Illinois Department of
Public Aid, and E. Allen Bernardi, Director of the Illinois
Department of Labor, Defendants-Appellants,
Michael Lavelle, Chairman of the Board of Election
Commissioners of the City of Chicago, Corneal
Davis and James R. Nolan, Commissioners,
Defendants-Appellees.
 Nos. 83-1115, 83-1323 and 83-1610.
 United States Court of Appeals,
Seventh Circuit.
 Argued Sept. 21, 1983.
Decided Feb. 14, 1984.
 
 James C. O'Connell, Asst. Atty. Gen., Welfare Litigation, Chicago, Ill., for defendants-appellants.
 Thomas Johnson, Legal Asst. Found. of Chicago, Chicago, Ill., for plaintiffs-appellees.
 Before ESCHBACH and POSNER, Circuit Judges, and SWYGERT, Senior Circuit Judge.
 POSNER, Circuit Judge.
 
 
 1
 We must decide in this case whether an association that is dedicated to increasing the political power of the poor and the unemployed, but that has no members who are not registered to vote, has standing to litigate the question whether the First Amendment requires a state to permit local election officials to register voters in the state's public aid and unemployment compensation offices.
 
 
 2
 At the time this suit began, P.O.W.E.R. ("People Organized for Welfare and Employment Rights") was an association of members of various community, civil rights, and welfare rights organizations in Chicago such as the Chicago Urban League, the Chicago Welfare Rights Organization, and Operation P.U.S.H. Its goal, in its words, was "to organize persons eligible for public assistance and unemployment compensation benefits, to educate them as to their legal rights, including their right to vote, and to improve the social and economic conditions under which they live through all lawful means, including the electoral process." It conducted its first voter registration drive in the summer and fall of 1982. Its volunteers were allowed into the waiting rooms of Illinois Department of Public Aid and Department of Labor offices throughout Chicago to try to persuade people coming to the offices for their welfare or unemployment compensation checks to register to vote. The actual registration was done by registrars of the city's Board of Election Commissioners at tables set up on the sidewalks outside the offices.
 
 
 3
 The registration drive was a big success and P.O.W.E.R. wanted to repeat it for the 1983 mayoral primary and general elections, scheduled for February 22 and April 12. The problem was that it might be too cold then for outdoor registration. The Board of Election Commissioners had the use of only two mobile registration vans, not enough to cover the 36 major public aid and unemployment compensation offices in Chicago. P.O.W.E.R. asked the state to allow the Board's registrars to conduct voter registration in the waiting rooms. When the state refused, P.O.W.E.R. brought this suit (in its name and that of two of its members) under 42 U.S.C. Sec. 1983 against the responsible state officers, claiming that the refusal to admit the registrars violated the First Amendment. The theory was that registration and voting are forms of expression. The Board of Election Commissioners was named as an additional defendant though it later turned out that the Board was perfectly willing to put its registrars in the waiting rooms.
 
 
 4
 The district court granted a preliminary injunction directing the Board to assign registrars to the waiting rooms and forbidding the state defendants to interfere. Registration for the February and April elections was conducted in the waiting rooms pursuant to the injunction. After the elections P.O.W.E.R. moved the district judge for a voluntary dismissal of its suit. Fed.R.Civ.P. 41(a)(2). The district judge granted the motion and awarded $13,000 in attorney's fees to P.O.W.E.R. under 42 U.S.C. Sec. 1988, 559 F.Supp. 54, to be paid entirely by the state defendants. Those defendants appealed the fee award along with the orders granting the preliminary injunction and allowing voluntary dismissal of the suit. See 28 U.S.C. Secs. 1291, 1292(a)(1); Stern v. Barnett, 452 F.2d 211 (7th Cir.1971).
 
 
 5
 We must first consider whether the case has become moot. Not only are the elections originally involved in the case long past, but P.O.W.E.R. has been dissolved and the Illinois legislature has enacted a law (Sen. Bill 1301), effective November 3, 1983, which the appellees contend requires the state to allow registration in the waiting rooms of state welfare and unemployment compensation (among other state) offices. Actually, the provisions of the bill are complex, and it is not clear that the bill means just what the appellees say it means. But we need not get into that here; we need not decide whether the new statute has mooted the substantive controversy between the parties, or whether P.O.W.E.R.'s dissolution has. These are difficult questions. Until it filed its motion to dismiss the two substantive appeals, after oral argument in this case, P.O.W.E.R. conceded that the case was not moot just because the elections were over and done with, since it intended to seek the same kind of preliminary injunction the next time there was a primary or general election in Chicago. See Nebraska Press Ass'n v. Stuart, 427 U.S. 539, 546, 96 S.Ct. 2791, 2796, 49 L.Ed.2d 683 (1976); Southern Pac. Terminal Co. v. ICC, 219 U.S. 498, 515, 31 S.Ct. 279, 283, 55 L.Ed. 310 (1911). And though P.O.W.E.R. has now been dissolved, it was a coalition of organizations which still exist and which could and presumably would reconstitute P.O.W.E.R. in advance of the next round of elections, if need be.
 
 
 6
 But however these questions are answered, the plaintiffs cannot obtain the attorney's fees that they seek, and that the defendants in No. 83-1610 ask us to deny, unless P.O.W.E.R. or one of the other plaintiffs had standing to bring this lawsuit in the first place. Standing is a jurisdictional prerequisite. See, e.g., Davis v. Passman, 442 U.S. 228, 239 n. 18, 99 S.Ct. 2264, 2274 n. 18, 60 L.Ed.2d 846 (1979). If the district court never acquired subject-matter jurisdiction of this case it had no power to order the defendants to pay the plaintiffs their attorney's fees, and the defendants are entitled to have that order, along with all the other orders in the case, set aside. But we shall not have to decide whether the award of attorney's fees saves the entire case from being moot, on the theory that a plaintiff is not a prevailing party within the meaning of section 1988 if he had no legal right to the preliminary relief he obtained. See Comment, Civil Rights Attorney's Fees Awards in Moot Cases, 49 U.Chi.L.Rev. 819, 836 (1982).
 
 
 7
 It may seem odd that P.O.W.E.R. should continue to seek an award of attorney's fees after it has been dissolved. If dissolution moots the substantive controversy between the plaintiffs and the (state) defendants, as P.O.W.E.R. argues, it is not obvious why it does not also moot the controversy over attorney's fees. We take it, however, that P.O.W.E.R.'s successors in interest, presumably the organizations that formed it originally, have succeeded to any rights it may have had to an award of attorney's fees, and we have absolutely no reason to doubt that the lawyers who have filed papers with us on P.O.W.E.R.'s behalf after its formal dissolution are legitimate representatives of its constituent organizations. The defendants do not question the lawyers' bona fides; nor shall we. In any event, these lawyers also represent the individual plaintiffs in the case, who are appellants along with P.O.W.E.R. in the attorney's fee appeal. And so we come at last to the issue of standing.
 
 
 8
 It is usual to begin discussion of an organization's standing to sue by saying that it has standing if it alleges an injury to itself, as in Chicano Police Officer's Ass'n v. Stover, 526 F.2d 431, 436 (10th Cir.1975), vacated on other grounds, 426 U.S. 944, 96 S.Ct. 3161, 49 L.Ed.2d 1181 (1976), or (with certain qualifications, see Hunt v. Washington State Apple Advertising Comm'n, 432 U.S. 333, 343, 97 S.Ct. 2434, 2441, 53 L.Ed.2d 383 (1977); International Union v. Johnson, 674 F.2d 1195, 1200 (7th Cir.1982), not necessary to discuss here) if it alleges an injury to its members. See NAACP v. Alabama, 357 U.S. 449, 459, 78 S.Ct. 1163, 1170, 2 L.Ed.2d 1488 (1958); Sierra Club v. Morton, 405 U.S. 727, 739, 92 S.Ct. 1361, 1368, 31 L.Ed.2d 636 (1972); Rockford League of Women Voters v. Nuclear Regulatory Comm'n, 679 F.2d 1218, 1221-22 (7th Cir.1982). A problem in a case such as this brought under 42 U.S.C. Sec. 1983, a civil rights tort statute, is that section 1983 contains no suggestion that Congress wanted to allow an association to sue to enforce not only its own civil rights but those of its members. See Currie, Misunderstanding Standing, 1981 Sup.Ct.Rev. 41, 45. But pass that point and assume that if P.O.W.E.R. were complaining that the defendants had made it difficult for one or more of P.O.W.E.R.'s members to register to vote, it would have standing. This assumption does not help P.O.W.E.R. It has never alleged that any of its members were not registered to vote or had incurred inconvenience in registering; and at argument its counsel was emphatic in disclaiming any intention to base standing on such a theory. Nor has it contended (except obliquely in a footnote of its appeal brief--too little and too late) that it should have been allowed to sue as the representative of the unregistered because they are unable to look after their own interests, or for any other reason.
 
 
 9
 P.O.W.E.R. in bringing this suit alleged only that its goal of improving the lot of the poor and the unemployed required for its fulfillment that the state make it easier for them to register. This might be a persuasive basis for standing if P.O.W.E.R. had been trying to advance its goal by registering new voters itself. Anyone who prevented it from doing that would have injured it, see Havens Realty Corp. v. Coleman, 455 U.S. 363, 379, 102 S.Ct. 1114, 1124, 71 L.Ed.2d 214 (1982); Chicano Police Officer's Ass'n v. Stover, supra, 526 F.2d at 436, just as the defendants in this case would have injured it if they had prevented it from going into waiting rooms and urging the people waiting there to register. But P.O.W.E.R. was never forbidden to do that, and never sought to do the actual registering of voters. Although the complaint contains an allegation that the two named plaintiffs "seek to advance the political, social, and economic goals of P.O.W.E.R. by assisting, as volunteers, in the proposed voter registration drive and by registering voters, in conjunction with BOE registrars ..." (emphasis added), read in context all this means is that the plaintiffs wanted to bring about the registration of new voters by employees of the Board of Election Commissioners. As one of P.O.W.E.R.'s memoranda in the district court explained, "P.O.W.E.R. volunteers ... would, for a limited period of time, peaceably speak with applicants and recipients at each of the thirty-six state public aid and unemployment compensation offices located in Chicago about the need and opportunity available to register, and encourage and assist them in registering while they wait in the public aid and unemployment offices to see caseworkers and other staff. Registrars, who are employees of the [Board of Election Commissioners] would be available in the public aid and unemployment office waiting rooms to register those applicants and recipients who wished to register." No interference with what P.O.W.E.R. did, as distinct from what it wanted others (the Board of Election Commissioners and the state defendants) to do to help it achieve its goals, was alleged.
 
 
 10
 All of us want government to do things to or for other people: for example, to enforce the criminal laws more strictly, or more leniently. P.O.W.E.R. (until it was disbanded) wanted Illinois to allow the registration of voters in the waiting rooms of state welfare and unemployment offices. But desire does not create standing. If you become indignant reading about a case of police brutality, you cannot sue the responsible officers in federal court under 42 U.S.C. Sec. 1983, though the (immediate) victim might well have a suit; much less can you sue to force the state to conduct a referendum on police brutality, even if the referendum would alleviate your outrage at the officers' violation of federal civil rights law. If you happen to think it a scandal that less than half the eligible voters actually vote in most American elections, still you cannot sue the government demanding that it be ordered to punish nonvoters--and you could not even if, as in some other countries, the law required people to vote. The injury brought about by a violation of law must, to support a federal court action, be more direct and immediate than this. It must at least resemble the type of injury that would support a lawsuit under traditional principles of common law or equity; it must therefore affect one's possessions or bodily integrity or freedom of action, however expansively defined (as in United States v. SCRAP, 412 U.S. 669, 688, 93 S.Ct. 2405, 2416, 37 L.Ed.2d 254 (1973)), and not just one's opinions, aspirations, or ideology. See, e.g., Schlesinger v. Reservists Comm. to Stop the War, 418 U.S. 208, 225-26, 94 S.Ct. 2925, 2934-35, 41 L.Ed.2d 706 (1974); D'Amico v. Schweiker, 698 F.2d 903 (7th Cir.1983); Myron v. Chicoine, 678 F.2d 727, 730 (7th Cir.1982); Fisher v. Tucson School Dist. No. One, 625 F.2d 834, 837-38 (9th Cir.1980); Vander Jagt v. O'Neill, 699 F.2d 1166, 1177-78 (D.C.Cir.1983) (concurring opinion). It must in short be fairly describable as an injury personal to the plaintiff--a deprivation of his right--rather than a concern with another's injury.
 
 
 11
 The element of personal injury, of deprivation of a personal right, is missing here. Although P.O.W.E.R.'s goal of more power to the poor and to the unemployed may not be fully achievable unless the state cooperates in certain ways, the lack of cooperation of others in our dreams is not a personal injury in an accepted sense. Suppose P.O.W.E.R.'s goal had been to reduce illiteracy among the Eskimos, and to this end it asked the State of Alaska to establish a program of adult education in remote areas of the state. If the state refused, this would impair P.O.W.E.R.'s goal, but P.O.W.E.R. would not have standing to sue the responsible state officials in federal court unless perchance it had illiterate Eskimos among its members.
 
 
 12
 P.O.W.E.R. argues, however, that such examples are inapplicable to an organization engaged as it was in political advocacy. But we cannot see what difference that makes. The State of Illinois never interfered with P.O.W.E.R.'s efforts to persuade the people in the waiting rooms to register. It only prevented a third party, the city's election board, from registering people there. A television network does not have standing to sue a retail dealer for wrongful repossession of a television set from one of the network's viewers. If an organization advocated doing away with the death penalty its advocacy would be protected by the First Amendment but it could not therefore bring a suit to enjoin a state from carrying out executions or force the state to conduct a voter-registration campaign among groups believed likely to oppose capital punishment. The injury that P.O.W.E.R. alleged is as tenuous as that held insufficient to confer standing in Winpisinger v. Watson, 628 F.2d 133 (D.C.Cir.1980), where the supporters of one Presidential candidate alleged that the federal government was illegally supporting a rival's candidacy.
 
 
 13
 Of course if the right of free speech were defined as the right to have the state facilitate the registration of voters who are likely to support the goals that the plaintiff advocates, the action of the state defendants in this case would amount to a deprivation of that right. But we do not understand P.O.W.E.R. to be taking so extreme a position on the merits. We understand it to be arguing that its right of advocacy was burdened by the state's refusal to cooperate in making its advocacy effective. But this burden is not the personal injury that is required to establish standing. With immaterial exceptions, see, e.g., Indian Towing Co. v. United States, 350 U.S. 61, 69, 76 S.Ct. 122, 126, 100 L.Ed. 48 (1955), if you have no right to demand assistance the failure to assist you is not an injury that will support a federal suit, even though such a failure may make the rights you do have, which include the right of political advocacy, less fruitful in achieving your goals. No more does it help P.O.W.E.R. to argue that the defendants interfered with its voter registration drive. A transitive verb will not convert inaction into action. The defendants did not prevent P.O.W.E.R. from doing anything it wanted to do; they merely refused to take steps that would have made P.O.W.E.R.'s actions more effective in attaining its aims of registering the poor and the unemployed; and such a refusal is not an injury that will support a federal court action.
 
 
 14
 Yet all this talk of injury will strike some readers as the sheerest casuistry, now that the minimum amount in controversy requirement has been abolished in federal-question cases and a plaintiff can establish standing by alleging that the defendant's misconduct injured him directly and immediately to the tune of $1, or for that matter 1cents. The discounted present value of the harm alleged in SCRAP and held by the Supreme Court to confer standing could not have been much more: "a general rate increase [the challenged conduct] would allegedly cause increased use of nonrecyclable commodities as compared to recyclable goods, thus resulting in the need to use more natural resources to produce such goods, some of which resources might be taken from the Washington area, and resulting in more refuse that might be discarded in national parks [used by the five members of the plaintiff organization] in the Washington area." 412 U.S. at 688, 93 S.Ct. at 2416. Although P.O.W.E.R.'s freedom of action was not curtailed in the (trivial) way in which the plaintiffs' free use and enjoyment of national parks was allegedly curtailed in SCRAP, P.O.W.E.R. was and is (even after its formal demise!) as likely to litigate its case vigorously as the plaintiffs in SCRAP were. Indeed, willingness to finance major federal litigation is evidence enough that the plaintiff has sufficient sense of injury to induce him to litigate effectively, thus assuring that the court that decides the case will have the benefit of a vigorous adversary presentation of the issues. See Scott, Standing in the Supreme Court--A Functional Analysis, 86 Harv.L.Rev. 645, 674 (1973).
 
 
 15
 This attack on the requirement of a personal injury would be unanswerable if the only concern behind the standing doctrine were making sure that cases in which new law might be made would be vigorously contested. But it is not the only concern. Another, which has great importance today, is the need to limit the amount of litigation. In such a wealthy society as ours there is a great deal of money available for financing the promoters of causes, some of whom want to use the courts as well as public opinion and the legislatures to advance their goals. If passionate commitment plus money for litigating were all that was necessary to open the doors of the federal courts, those courts, already overburdened with litigation of every description, might be overwhelmed. Cf. Matter of Int'l Business Machines Corp., 687 F.2d 591 (2d Cir.1982).
 
 
 16
 Another problem when the immediate injury from alleged misconduct is suffered by someone other than the plaintiff is that the suit may lack, not adversary zeal--that it may have in great abundance--but the concrete factual setting that so concentrates the judicial mind. And, a related point, the ability of the actual victim to protect his legal rights may be impaired by the activity of his self-appointed protectors. The present suit is in effect an unauthorized representative action on behalf of recipients of public aid and unemployment compensation who are not registered to vote, although P.O.W.E.R. formally disclaims, as it must, basing its standing to sue on the interests of nonmembers. See Gladstone, Realtors v. Village of Bellwood, 441 U.S. 91, 100, 99 S.Ct. 1601, 1608, 60 L.Ed.2d 66 (1979); Warth v. Seldin, 422 U.S. 490, 499, 95 S.Ct. 2197, 2205, 45 L.Ed.2d 343 (1975); Minority Police Officers Ass'n v. City of South Bend, 721 F.2d 197, 202 (7th Cir.1983); Fairley v. Patterson, 493 F.2d 598, 604 (5th Cir.1974). If P.O.W.E.R. had sustained a personal injury, it might be able to assert the right of another, as the owner of a bar who was punished for selling beer to boys under 18 was allowed in Craig v. Boren, 429 U.S. 190, 97 S.Ct. 451, 50 L.Ed.2d 397 (1976), to assert the boys' right not to be discriminated against because of their sex. See also Barrows v. Jackson, 346 U.S. 249, 73 S.Ct. 1031, 97 L.Ed. 1586 (1953). But it did not, and therefore may not.
 
 
 17
 No persons who are not registered to vote are parties to this suit or members of the plaintiff organization. Although some of them could have been called as witnesses, no one bothered to call any and as a result the record tells us nothing about the inconvenience, if any, that poor or unemployed people have experienced in registering to vote at the places where the Board of Election Commissioners conducts registration in cold weather. We are told, and believe since it is not denied, that P.O.W.E.R.'s first registration drive netted many thousands of new voters. But we do not know how many of them registered only because registration tables were set up on the sidewalks outside the offices where P.O.W.E.R. was recruiting. Although P.O.W.E.R. is most vigorous in advocating its conception of the interests of the unregistered poor and of the unregistered unemployed, it neither associated members of those groups as parties plaintiff nor recruited them as members of the organization. It would be presumptuous of us to adjudicate issues that touch the welfare of the unregistered poor and unemployed more closely than it touches that of the organization that is seeking to improve their condition from the outside, as it were, when no members of the allegedly injured class are present.
 
 
 18
 The requirement of what we have called personal injury "tends to assure that the legal questions presented to the court will be resolved, not in the rarified atmosphere of a debating society, but in a concrete factual context conducive to a realistic appreciation of the consequences of judicial action.... The Art[icle] III requirement of standing also reflects a due regard for the autonomy of those persons likely to be most directly affected by a judicial order. The federal courts have abjured appeals to their authority which would convert the judicial process into 'no more than a vehicle for the vindication of the value interests of concerned bystanders.' ... The exercise of judicial power, which can so profoundly affect the lives, liberty, and property of those to whom it extends, is therefore restricted to litigants who can show 'injury in fact' resulting from the action which they seek to have the court adjudicate." Valley Forge Christian College v. Americans United for Separation of Church and State, Inc., 454 U.S. 464, 472-73, 102 S.Ct. 752, 758-59, 70 L.Ed.2d 700 (1982). When the concept of injury is looked at in this light it becomes apparent that P.O.W.E.R. failed to allege or prove an injury.
 
 
 19
 The judgment of the district court is therefore vacated and the case remanded with directions to dismiss the complaint, and vacate all judicial orders in the case (including the attorney's fee award), for lack of federal subject-matter jurisdiction.
 
 
 20
 SWYGERT, Senior Circuit Judge, dissenting.
 
 
 21
 The majority opinion vacates the district court's orders in this case based on a determination that P.O.W.E.R. had no standing to bring this suit. It concludes, therefore, that the district court lacked subject matter jurisdiction. I would vacate the district court's preliminary injunction order and dismissal order on the ground that the case is now moot; however, because I believe P.O.W.E.R. had standing to bring suit and that it is a "prevailing party" within the meaning of 42 U.S.C. Sec. 1988, I would affirm the district court's award of attorneys fees to P.O.W.E.R.
 
 
 22
 P.O.W.E.R., a coalition of twenty-one Chicago civil rights, welfare rights, and community rights organizations, was formed in the belief that the relatively limited extent to which the poor participate in the political process had contributed to the development of governmental policies adverse to their interests. P.O.W.E.R.'s goal was to increase the number of poor persons registered to vote and secure political change through the electoral process. In pursuit of this goal, P.O.W.E.R. decided to organize several non-partisan voter registration drives in which P.O.W.E.R. would associate with and organize persons eligible for public assistance and unemployment compensation benefits; inform them of their legal rights, including the right to vote; discuss with them the need and available opportunity to register to vote; and make registration facilities immediately accessible to them.
 
 
 23
 The first registration drive was conducted in August and September 1982 in accordance with an agreement between P.O.W.E.R., the Chicago Board of Election Commissioners ("BOE"), and state officials representing the Illinois Department of Public Aid ("IDPA"), and the Illinois Department of Labor ("IDOL"). P.O.W.E.R. volunteers conducted this registration drive by speaking with potential registrants in the waiting rooms of thirty IDPA and IDOL offices, by providing vans and card tables as facilities at which people could register outside the offices, and by assisting BOE employees, who were the only individuals with statutory authority to take voter registrations at temporary registration sites. Ill.Rev.Stat. ch. 46, Sec. 6-50.3 (1981). In light of its success in registering more than 42,000 people, P.O.W.E.R. proposed a second voter registration drive to begin on November 8, 1982 and continue until January 17, 1983. This proposal differed from the original agreement in that P.O.W.E.R. insisted that the voter registration take place inside the IDPA and IDOL offices after December 1, 1982 because of cold weather. In responding to P.O.W.E.R.'s new proposal, the state officials refused to allow BOE registrars to enter the waiting rooms of IDPA and IDOL offices for the purpose of registering voters.
 
 
 24
 P.O.W.E.R. then brought this suit claiming that the state defendants' policy prohibiting voter registration inside the waiting rooms violated P.O.W.E.R.'s first and fourteenth amendment rights of free speech, assembly, and association. P.O.W.E.R. argued that having registrars available to potential registrants was an integral part of its expression encouraging voter registration and its association with potential registrants. The district court issued a preliminary injunction order against enforcement of the state policy prohibiting on-site voter registration, and directed the state defendants to permit two P.O.W.E.R. volunteers and one BOE registrar access to the waiting rooms under guidelines set by the court.[1] The injunction was based, in part, on the court's findings that the state defendants' policy had prevented P.O.W.E.R. from conducting its registration drive, that P.O.W.E.R. had demonstrated a reasonable likelihood of success on the merits of their constitutional claim, and that the state defendants had failed to prove that their policy was content neutral or served any legitimate or significant governmental interest. After the second registration drive was successfully completed in accordance with the court's order, the district court granted P.O.W.E.R.'s motion for a voluntary dismissal and P.O.W.E.R.'s motion for an award of attorneys fees and costs.
 
 
 25
 The state defendants have appealed the preliminary injunction order, the dismissal order, and the fee award. After oral argument in this court, P.O.W.E.R. moved to dismiss as moot the appeals of the preliminary injunction and dismissal orders based on an affidavit stating that P.O.W.E.R. had been disbanded and on the Illinois legislature's approval of the governor's amendatory veto to previously-enacted Senate Bill 1301.[2] The newly-approved legislation amends the provisions of Illinois law governing voter registration. The amendments, in part, require the BOE to appoint the officials or members of bonafide state civic organizations as deputy registrars, and permit the volunteer deputy registrars to staff temporary places of registration. 1984 Ill.Legis.Serv. .... (West). More importantly for purposes of this appeal, the legislation also amends the Illinois Public Aid Code, Ill.Rev.Stat. ch. 23, Sec. 12-4, and The Unemployment Insurance Act, Ill.Rev.Stat. ch. 48, Sec. 615, by adding a new provision to each which states that IDPA and IDOL respectively, "shall make [its offices] available for use as temporary places of registration." 1984 Ill.Legis.Serv. .... (West).
 
 
 26
 P.O.W.E.R. argues, based on these recent developments, that the controversy is no longer capable of repetition and is therefore moot. In light of P.O.W.E.R.'s affidavit and the new legislation, the case is now moot. Because the preliminary injunction has expired and the issues presented are no longer "live," see Murphy v. Hunt, 455 U.S. 478, 481-82, 102 S.Ct. 1181, 1182-83, 71 L.Ed.2d 353 (1982) (per curiam), this controversy is justiciable only if it satisfies the "capable of repetition, yet evading review" exception to the live controversy requirement. See DeFunis v. Odegaard, 416 U.S. 312, 94 S.Ct. 1704, 40 L.Ed.2d 164 (1974) (per curiam); Southern Pacific Terminal Co. v. Interstate Commerce Commission, 219 U.S. 498, 515, 31 S.Ct. 279, 283, 55 L.Ed. 310 (1911). This exception, however, does not save the instant controversy from mootness.
 
 
 27
 The "capable of repetition, yet evading review" doctrine is limited to the situation where two elements exist: (1) the challenged action was too short in duration to be litigated fully before it ceased, and (2) there is a reasonable expectation that the same complaining party will be subjected to the same action again. Murphy, supra, 455 U.S. at 482, 102 S.Ct. at 1183; Weinstein v. Bradford, 423 U.S. 147, 149, 96 S.Ct. 347, 348, 46 L.Ed.2d 350 (1975) (per curiam). A mere theoretical possibility of a recurrence is insufficient to satisfy the second element, rather there must be a "demonstrated probability" that the same controversy will occur again involving the same complaining party. Murphy, supra, 455 U.S. at 482-83, 102 S.Ct. at 1183-84; Weinstein, supra, 423 U.S. at 149, 96 S.Ct. at 348.
 
 
 28
 In this case there no longer is a reasonable probability that P.O.W.E.R. will be prevented from conducting a voter registration drive by a state official's decision to prohibit all on-site voter registration in IDPA and IDOL offices. This situation would recur only if P.O.W.E.R. reorganized to conduct a voter registration drive in IDPA or IDOL waiting rooms and if state officials prohibited the on-site registration. Neither party demonstrates that P.O.W.E.R. plans to reorganize. If P.O.W.E.R. should reorganize, not only is the content of any registration drive proposal uncertain, but the state officials' response to such a proposal is also speculative. While the parties disagree as to the extent of the state officials' obligations under the new legislation, the statute expressly precludes the option of a blanket prohibition on voter registration in IDPA and IDOL offices. Thus the recurrence of the same controversy is not likely, and the nature of any other controversy is only speculative. Such a theoretical possibility does not supply a justiciable controversy at this time.
 
 
 29
 Regardless of whether the underlying controversy is now moot, however, the state defendants argue that a decision on the merits must be made to determine the propriety of the district court's award of fees and costs to P.O.W.E.R. Their position is that P.O.W.E.R. is not a "prevailing party" within the meaning of 42 U.S.C. Sec. 1988 unless this court decides that P.O.W.E.R. was entitled to the relief it sought. This argument, however, is contrary to the decisions of several courts of appeals, which have held that a dispute over an attorneys fees award does not preserve an underlying controversy which otherwise has become moot on appeal. Bishop v. Committee on Professional Ethics and Conduct of the Iowa State Bar Association, 686 F.2d 1278, 1290 (8th Cir.1982); United States v. Ford, 650 F.2d 1141, 1143 (9th Cir.1981), cert. denied sub nom. Midwest Growers Cooperative v. United States, 455 U.S. 942, 102 S.Ct. 1437, 71 L.Ed.2d 654 (1982); Doe v. Marshall, 622 F.2d 118, 119-20 (5th Cir.1980), cert. denied, 451 U.S. 993, 101 S.Ct. 2336, 68 L.Ed.2d 855 (1981); Bagby v. Beal, 606 F.2d 411, 414 (3d Cir.1979). Although this circuit has yet to decide this issue, the state defendants provide no authority for their position and I am persuaded that the merits of a moot controversy should not be decided because of a dispute over attorneys fees.
 
 
 30
 The only issue remaining, therefore, is whether the district court's award of attorneys fees should otherwise be reversed. In a number of cases, courts have held that a dismissal of the underlying controversy because of mootness does not preclude an award of attorneys fees. See, e.g., Bishop, supra, 686 F.2d at 1290; Williams v. Alioto, 625 F.2d 845, 847-48 (9th Cir.1980), cert. denied, 450 U.S. 1012, 101 S.Ct. 1723, 68 L.Ed.2d 213 (1981); Doe v. Marshall, supra, 622 F.2d at 118; Bagby, supra, 606 F.2d at 414-15. Furthermore, particularly where the district court had granted the plaintiff the relief requested based on a determination of the likelihood of success on the merits, the plaintiff should be considered a "prevailing party," and therefore is entitled to attorneys fees, even if the relief was preliminary in nature. Coalition for Basic Human Needs v. King, 691 F.2d 597 (1st Cir.1982); Williams, supra, 625 F.2d at 847-48. See also Deerfield Medical Center v. City of Deerfield Beach, 661 F.2d 328, 339 (5th Cir.1981); Doe v. Marshall, supra, 622 F.2d at 118; Bagby, supra, 606 F.2d at 415-16. But cf. Smith v. University of North Carolina, 632 F.2d 316 (4th Cir.1980). Consequently, the fee award in this case should not be reversed.
 
 
 31
 The majority concludes, however, that the fee award must be vacated because the district court lacked subject matter jurisdiction over the controversy and therefore had no power to award attorneys fees. Because I believe that P.O.W.E.R. satisfied the Article III requirements for standing and therefore conclude that subject matter jurisdiction was not lacking, I do not agree that the fee award must be vacated.
 
 
 32
 Article III limits the federal judicial power to those disputes where the plaintiff can show that he personally suffered some actual or threatened injury as a result of the putatively illegal conduct of the defendant, Gladstone, Realtors v. Village of Bellwood, 441 U.S. 91, 99, 99 S.Ct. 1601, 1607, 60 L.Ed.2d 66 (1979), and that the relief sought is likely to cure or redress the injury. Valley Forge Christian College v. Americans United for Separation of Church and State, Inc., 454 U.S. 464, 472, 102 S.Ct. 752, 758, 70 L.Ed.2d 700 (1982). The "actual injury" requirement reflects several implicit policies embodied in Article III. It assures that courts will resolve legal issues in a concrete factual context, with a realistic appreciation for the implications of their decisions. Valley Forge, supra, 454 U.S. at 472, 102 S.Ct. at 758. Similarly the "actual injury" requirement seeks to ensure that decisions to litigate will be made by those who would be directly affected by the outcome, and not those who seek only to vindicate their value preferences. Sierra Club v. Morton, 405 U.S. 727, 740, 92 S.Ct. 1361, 1368, 31 L.Ed.2d 636 (1972).
 
 
 33
 Giving due regard to the concerns underlying the injury requirement, and applying that requirement to this case, P.O.W.E.R.'s allegations[3] have satisfied the Article III standing requirements.[4] The majority's argument that P.O.W.E.R. was not injured is plausible only because it ignores that the state officials' prohibition on on-site voter registration was in response to P.O.W.E.R.'s registration drive proposal, and that the obvious effect of the prohibition would have been to interfere with, if not to preclude, P.O.W.E.R.'s drive had the district court not enjoined enforcement of the state's policy. P.O.W.E.R. was not just asking the state to cooperate in its goals, it was asking state officials to permit it to conduct a voter registration drive in certain offices. Even though state officials did not prohibit P.O.W.E.R. from speaking to recipients and applicants, they prohibited an integral part of P.O.W.E.R.'s proposed drive--making registration facilities immediately available, with BOE's consent, to potential registrants with whom P.O.W.E.R. volunteers had spoken. P.O.W.E.R.'s association with potential registrants and its communication of the importance of voter registration would have been effectively diminished; its ultimate message concerning government policies that affect the poor and the unemployed would have been diluted.
 
 
 34
 P.O.W.E.R. was requesting assistance from the state officials only in the same way that many groups and individuals may request government officials to make public places available for the exercise of first amendment activities. Demonstrations, marches, and pamphleting organized to advance certain beliefs or goals would not take place on public property without the cooperation of public officials. Yet when official decisions stand as obstacles to such activities, the groups or individuals organizing the activities have standing to challenge those decisions. Likewise, P.O.W.E.R. was challenging the state officials' decision prohibiting on-site voter registration--the only obstacle to their organized activity.
 
 
 35
 P.O.W.E.R.'s allegations provided a concrete factual situation in which the first amendment issues it raised could be decided. It was not seeking to vindicate its value preferences, it was seeking review of a state policy that would have precluded its voter registration drive. The outcome of the litigation directly affected P.O.W.E.R.'s activities. While it also created additional voter registration opportunities for unemployment compensation and public assistance recipients and applicants, this result should not defeat P.O.W.E.R.'s standing, particularly when potential registrants could choose not to avail themselves of the opportunities. P.O.W.E.R. has shown actual injury and none of the concerns underlying the Article III requirement suggest otherwise. Consequently, P.O.W.E.R. had standing to bring this suit, and it is entitled to attorneys fees for achieving the relief it sought.
 
 
 
 [1]
 Under the agreement covering the first registration drive, P.O.W.E.R. was allowed to place up to three volunteers in each waiting room and up to three additional volunteers outside each office
 
 
 [2]
 The Illinois House of Representatives and the Illinois Senate originally passed Senate Bill 1301 on July 1, 1983. On September 26, 1983, Governor Thompson, in exercising his amendatory veto power, added certain provisions and deleted others. The Senate and the House approved the Governor's changes on October 19, 1983 and November 3, 1983, respectively. Governor Thompson then certified the bill and it became law on January 5, 1984. Pub.Act 83-1059. See Ill. Const. art. IV, Sec. 9(e). Under the Illinois Constitution, the effective date of the legislation will be July 1, 1984. Ill. Const. art. IV, Sec. 10
 
 
 [3]
 When considering standing, the allegations of the plaintiff's complaint must be accepted as true. Gladstone, Realtors, supra, 441 U.S. at 109, 99 S.Ct. at 1612
 
 
 [4]
 Because standing is being addressed here as a matter of subject matter jurisdiction, it would be improper to consider any additional prudential limitations on standing